SARGENT COUNTY, a Municipal Corporation, Respondent, v. STATE OF NORTH DAKOTA Doing Business as the Bank of North Dakota, Appellant.

(182 N. W. 270.)

**Banks and banking — Bank of North Dakota may function as a separate agency of the sovereign power.**

1. Pursuant to constitutional and statutory enactments, the Bank of North Dakota, as an agency of the sovereign power, engaged in the banking business, has a distinct status separate and apart from that of the state itself; this status permits it to function as a distinct and separate agency of the sovereign power.

**Banks and banking — garnishment — states — "garnishment" proceedings defined; statute relating to execution against state inapplicable to garnishment against Bank of North Dakota; under state banking act garnishment proceedings against Bank of North Dakota held proper.**

2. (a) A garnishment proceeding is an action: It creates no specific lien; it seeks to hold the garnishee to a personal liability and judgment, dependent upon his liability to the defendant. It is a remedy separate and distinct from attachment or execution.

(b) Section 8177, Comp. Laws 1913, which relates to executions against the state, has neither reference nor application to a direct garnishment proceeding ancillary to a suit against the Bank of North Dakota.

(c) Where a county has instituted action to recover deposits made in the Bank of North Dakota, and also garnishment proceedings against various state and national banks by reason of redeposits made by the Bank of North Dakota in such banks it is *held*, pursuant to the express provisions of § 22, chap. 147, Laws · 1919 (Bank of N. Dak. Act), that such garnishment proceedings are proper.

Opinion filed March 12, 1921. Rehearing denied April 4, 1921.

From an order refusing to vacate garnishment proceedings in Sargent County, *McKenna*, J., the defendant has appealed.

Affirmed.

*Wm. Lemke,* Attorney General, *W. A. Anderson,* Assistant Attorney General (*Simpson & Mackoff* and *S. E. Ellsworth* of counsel), for appellant.

"The industries under consideration in the present case are all pub-

47 N. D.—36.

lic industries belonging to the state of North Dakota. None of them are private industries or enterprises, but, on the contrary, are public enterprises and businesses exclusively owned and wholly operated by the state of North Dakota in its sovereign capacity, for the use and benefit of all the people of the state,—in other words, for a public purpose." Green v. Frazier (N. D.) 176 N. W. 20.

"There are certain principles which must be borne in mind in this connection, and which must control the decision of this court upon the Federal question herein involved. This legislation was adopted under the broad power of the state to enact laws raising by taxation such sums as are deemed necessary to promote purposes essential to the general welfare of its people." Green v. Frazier (U. S.) 40 Sup. Ct. Rep. 501.

"It (the supreme court of North Dakota) answered the contention that the industries involved were private in their nature, by stating that all of them belonged to the state of North Dakota, and therefore the activities authorized by the legislation were to be distinguished from business of a private nature having private gain for its objective." Green v. Frazier (U. S.) 40 Sup. Ct. Rep. 502.

"No execution shall issue against the state on any judgment, but whenever a final judgment against the state shall have been obtained in any action the clerk shall make and furnish to the state auditor a duly certified copy of such judgment, and the auditor shall, in due course, draw his warrant upon the state treasurer for such amount, and deliver the same to the person entitled thereto." Comp. Laws 1913, § 8177.

"Attachment is a mode of obtaining security for the satisfaction of any judgment which plaintiff may finally recover, an actual seizure of the goods of a debtor in order that they may be held to satisfy the judgment which plaintiff may recover in the future." 6 C. J. 29.

Garnishment is simply a convenient method of attachment.

"Garnishment is an attachment by means of which money or property of a debtor in the hands of third parties, which cannot be levied upon, may be subjected to the payment of the creditor's claim." American Cent. Ins. Co. v. Hettler, 37 Neb. 849, 40 Am. St. Rep. 522.

"Garnishment is attachment in the hands of a third person, and is thereby a species of seizure by notice." Baemer v. Winter, 41 Kan. 596.

"Garnishment, while in the nature of a proceeding in rem, is in effect an action by the defendant in the plaintiff's name against the garnishee, the purpose and result of which are to subrogate the plaintiff to the rights of the defendant against the garnishee." Neufelder v. German etc. Ins. Co. 6 Wash. 336, 36 Am. St. Rep. 166.

"Garnishment" is a mode of attachment differing in no material respect from an attachment by actual levy and seizure, except in the mode of enforcement." Rood, Garnishment, § 1.

"Property exempt from execution cannot be attached." Drake, Attachm. § 244.

"Officers of the United States, and of the different states, having money in their hands to which certain individuals are entitled, are not liable to the creditors of those individuals in the process of attachment, garnishment, and the like. This rule, as far as the same is applicable to national and state officers, has never been seriously questioned, having been established at an early date in the history of our government, and ever since sustained by the adjudications of both the national and state courts." Freeman, Executions, § 132; Drake, Attachm. § 516a.

"Every consideration of policy would forbid it. No government can sanction it. It would be very embarrassing generally, and, under some circumstances, might prove fatal to the public service, to allow the means of support of the servants of the government to be intercepted in the hands of the distributing agents. If the funds of the government, thus specifically appropriated for the support and maintenance of its agents, were allowed to be devested by process of attachment, in favor of creditors or otherwise, from their legitimate object, the functions of the government might be suspended." Bank of Tennessee v. Dibrell, 3 Sneed, 383. See also Divine v. Harvey, 7 T. B. Mon. 439, and valuable notes appended to this case in 18 Am. Dec. 200.

"Every banking association in this state shall be exempt from the legal process of attachment and execution." Comp. Laws 1913, § 5188.

### Appellant's Supplemental Brief.

Section 8177, Comp. Laws 1913, provides specifically that no execution shall be issued against the state on any judgment.

The authorities uniformly hold that an attachment is an execution issued in advance of trial and judgment. 2 R. C. L. 800, § 1.

So that, even under § 8177, Comp. Laws 1913, above mentioned, an attachment would not lie against the state.

That a garnishment is also an execution in advance, or at least in aid of it, see 12 R. C. L. 776, §§ 4, 5.

Therefore it follows that a garnishment also would not lie against the state.

"The legal effect of a garnishment judgment is to sequester or set aside the property or money of defendant in the hands of the garnishee for the payment of plaintiff's judgment." 12 R. C. L. 840, § 76 citing Bowen v. Port Huron Engine Co (Iowa) 47 L.R.A. 131, 80 N. W. 345.

To the same effect, see 12 R. C. L. 850, § 92, and Farrington v. Glemming (Neb.) 142 N. W. 297, 47 L.R.A.(N.S.) 742. Also Hart-zell v. Vigen, 6 N. D. 117.

In that case it was held that the court has power to make all necessary orders for the ultimate application of defendant's interest in the property in satisfaction of such judgment. Also see 2 Shinn, Attachm. & Garnishment, § 466, holding that the effect of garnishment is to sequester the property in the hands of the garnishee for the payment of plaintiff's judgment.

*S. A. Sweetman,* State's Attorney, *Engerud, Divet, Holt, & Frame,* for respondent.

The first question raised in this case was whether the Bank of Georgia might be sued in the circuit court of the United States, nothwithstanding the 11th Amendment to the Constitution. The reason urged why such suit could not be maintained was that the state of Georgia was a half owner in the bank. The court denies the contention, saying: "The suit is against a corporation, and the judgment is to be satisfied by the property of the corporation, not by that of the individual corporators. The state does not, by becoming a corporator, identify itself with the corporation. The Planters Bank of Georgia is not the state of Georgia, although the state holds an interest in it."

Again: "It is, we think, a sound principle that when a government becomes a partner in any trading company it devests itself so far as concerns the transaction of that company of its sovereign character, and takes that of a private citizen. Instead of communicating to the company its privileges and prerogatives, it descends to a level with those

with whom it associates itself and takes the character which belongs to its associates and to the business which is to be transacted. Thus many states of the Union, who have an interest in banks, are not suable even in their own courts, yet they never exempt the corporation from being sued. The state of Georgia, by giving to the bank the capacity to sue and be sued, voluntarily strips itself of its sovereign character so far as respects the transactions of the bank, and waives all the privileges of that character. As a member of a corporation a government never exercises its sovereignty, it acts merely as a corporation, and exercises no other power in the management of the affairs of the corporation than are expressly given by the incorporating act." Bank of U. S. v. Planters Bank, 9 Wheat. 904, 6 L. ed. 244.

A corporate body is known to the law by the powers and faculties bestowed upon it, expressly or impliedly, by the charter. The use of the term "corporation" in its creation is of itself unimportant except as it will imply the possession of these. They may be expressly conferred, and then they denote this legal being as unerringly as if created in general terms. Thomas v. Dakin, 22 Wend. 70; Gross v. Kentucky Board of Managers of the World Columbian Exposition, 43 L.R.A. 703; Hancock v. Louisville & N. R. Co. 145 U. S. 409, 36 L. ed. 755; Dunn v. State University, 9 Or. 357.

The question raised was that the state of Kentucky being the sole proprietor of the bank, the suit was virtually against the sovereign state.

The contention is disposed of by the court by quoting with approval from Bank of United States v. Planters Bank, saying, among other things, with reference to the status of the state:

"Instead of communicating to the company its privileges and its prerogatives, it descends to a level with those with whom it associates itself, and takes the character which belongs to its associates and to the business which is to be transacted." Bank of Kentucky v. Wister, 2 Pet. 318, 7 L. ed. 437; Briscoe v. Bank of Kentucky, 11 Pet. 257, 9 L. ed. 707.

Can it be doubted under these rules of law that the Bank of North Dakota could issue bills of credit without violating § 10 of the Constitution of the United States? If it could, it is not a branch of, or an agency of, the state, but a distinct business entity. Curran v. Arkansas, 15 How. 304, 14 L. ed. 705.

BRONSON, J.  *Statement.*—The defendant has appealed from an order overruling a motion to vacate a garnishment.  Sargent county has instituted an action against the defendant to recover a judgment of approximately, $125,000 upon deposits of moneys made in the Bank of North Dakota, both upon open account and otherwise.  At the same time, the county instituted a garnishment proceeding against some seventeen national and state banks, wherein it appears that the Bank of North Dakota has redeposited funds.  To the garnishment proceedings, the defendant interposed an answer alleging that the garnishment affidavits were false and untrue; that the garnishment summons were issued in plain violation of § 8177, Comp. Laws 1913, and is illegal and void, and that all of the property held by the garnishees belonging to the defendant is absolutely exempt from execution.  The defendant thereupon moved to dismiss such garnishment proceedings upon the grounds set forth in the answer.  The trial court overruled the motion.

At the general election, in November, 1918, the people ratified a constitutional amendment which provides, in part, that the state may make internal improvements, and may engage in any industry, enterprise, or business excepting the manufacture, sale, and disposition of intoxicating liquors.  Amend. N. D. Const. art. 32.

Pursuant thereto, the legislative assembly, in February, 1919, established the Bank of North Dakota.  Laws 1919, chap. 147.  The act declares the purpose of the state of North Dakota to engage in the banking business and establish a system of banking under the name of the Bank of North Dakota, owned, controlled, and operated by the state under the name of the "Bank of North Dakota."  The act further provides that the Industrial Commission (consisting of the governor, the attorney general, and the commissioner of agriculture and labor) shall operate, manage, and control the bank; that the bank shall be opened and shall proceed to business whenever there shall be delivered to the Industrial Commission bonds in the sum of $2,000,000 issued by the state; that the fund procured by the sale of such bonds shall be designated and known as the capital of such bank.  § 6.  All state, county, township, municipal, and school district funds, and funds of all penal, educational, and industrial institutions, and all public funds, were required to be deposited in such bank within three months after the passage and approval of the act, subject to certain exceptions.

§ 7. The bank was authorized to receive deposits from any source, including the United States government, and any foreign or domestic individual corporation, municipality, or bank, and to deposit funds to the credit of the bank in any bank or agency approved by the Industrial Commission. § 9. The act further provides that all deposits in the bank are hereby guaranteed by the state, and such deposits shall be exempt from all state, county, and municipal taxes at any and all times. § 10. Furthermore, that funds deposited by state banks in such Bank of North Dakota shall be deemed available funds pursuant to § 5170, Comp. Laws 1913 (relating to reserve funds of a state bank); that the Bank of North Dakota might perform the functions and render the service of a clearing house with reference to banks that make the Bank of North Dakota a reserve depositary. § 11. That all business of the bank may be conducted under the name of "The Bank of North Dakota;" that title to property pertaining to the operation of the bank shall be obtained and conveyed in the name of "The State of North Dakota Doing Business as the Bank of North Dakota." § 21.

Section 22 of the act provides as follows: "Civil actions may be brought against the state of North Dakota on account of causes of action claimed to have arisen out of transactions connected with the operation of the Bank of North Dakota, upon condition that the provisions of this section are complied with. In such actions the state shall be designated as "The State of North Dakota, Doing Business as the Bank of North Dakota," and the service of process therein shall be made upon the manager of said bank. Such actions may be brought in the same manner and shall be subject to the same provisions of law as other civil actions brought pursuant to the provisions of the Code of Civil Procedure. Such actions shall be brought, however, in the county where the Bank of North Dakota shall have its principal place of business, except as provided in §§ 7415, 7416, and 7418, Compiled Laws of North Dakota 1913. The provisions of §§ 375 and 657 of the Compiled Laws of 1913 shall not apply to claims against the state, affected by the provisions of this action."

Section 23 provides for the examination of such bank, at least twice annually, by the state examiner.

Pursuant to this act the Bank of North Dakota opened for business in July, 1919. It became the depositary of the public funds of munici-

pal subdivisions of the state, as well as of the state and its institutions. In August, 1920, after being in operation approximately one year, in this bank, pursuant to its statement of which judicial notice is taken, there were public deposits of over $15,000,000; deposits due depositary banks of about $1,700,000, and individual deposits of approximately $100,000. At that time the bank, pursuant to its statement, claimed a capital of $2,000,000, a surplus of $40,000; and a reserve of $30,000 and net profits for the year 1920 of over $171,000.

In a statement of the bank, under date of February 15, 1921, the public deposits, in round numbers, are listed as follows:

| | |
|---|---:|
| Sinking funds | $3,700,000 |
| General and other funds, state treasury | 2,400,000 |
| General and other funds, county, city, township, and school treasury | 3,800,000 |
| The capital is stated to be | 2,000,000 |
| Surplus | 40,000 |
| Reserve items | 34,000 |
| Net profits for 1920 | 121,000 |
| Net profits for 1921 | 8,000 |
| Individual deposits are listed at | 245,000 |

At the general election held on November 2, 1920, an initiative act was submitted to and adopted by the voters, which permits municipal subdivisions of the state to deposit their public funds in depositaries of their own choice.

The complaint in this action alleges that pursuant to this initiative act the county determined to discontinue further deposits of its funds in the Bank of North Dakota; that thereupon it drew checks upon its account wherein there were moneys therein to its credit, and such checks were dishonored in large numbers.

Section 8177, Comp. Laws 1913, provides: "No execution shall issue against the state on any judgment, but whenever a final judgment against the state shall have been obtained in any action, the clerk shall make and furnish to the state auditor a duly certified copy of such judgment, and the auditor shall in due course draw his warrant upon the state treasurer for such amount, and deliver the same to the person entitled thereto."

The defendant contends, viz.:  (1) The Bank of North Dakota is

the state of North Dakota doing business under the title of the Bank of North Dakota. It is an integral part of the state government, "an arm of the sovereign power," and an action brought against it, under the provisions of § 22, chapter 147, Session Laws 1919, is an action against the state. The funds or assets of the Bank of North Dakota, redepos· ited in the banks of Sargent county, are public funds of the state.

(2) Under the state law, execution is not permitted to be issued against the state of North Dakota on any judgment obtained against it. The process of garnishment is a provisional remedy closely analogous to attachment, and designed to aid the levy of execution; and this process is not applicable to the state; nor to a public fund belonging to or administered by the state.

*Decision.*—Two fundamental legal questions are involved: First, the status of the Bank of North Dakota, and, second, the right to avail of garnishment process in a proceeding against it.

*The Status of the Bank.*—The defendant maintains that the state is the bank, and the bank is the state; that the constitutional amendment granted this express sovereign power, and that the state has exercised such sovereign power in creating, operating, owning, and controlling this bank as the bank of the state. Further, it is contended that this court in Green v. Frazier, 44 N. D. 395, 176 N. W. 18, has expressly held that the Bank of North Dakota is not a private corporation, or private agency, but is, so to speak, an arm of the state's sovereign power, reaching out to execute its mandate, and that, when the Bank of North Dakota functions, it does so as an agency of this sovereign power, in a like manner as the treasurer of the state; that the same is true of every other state industry, which was the subject of controversy in that case.

It may not be denied that the state of North Dakota, pursuant to constitutional and statutory enactment, has engaged in the business or enterprise of banking. No question is raised in that regard. In the case of Green v. Frazier, supra, this court determined that the engagement of the state in such enterprise was for a public purpose to accomplish the objects sought thereby. Upon writ of error to the Supreme Court of the United States, that court declared that the united judgment of the people, the legislature, and the court of this state, that the purposes involved were public, would be accepted unless clearly

unfounded, and such court declined to set aside the action of this state in that regard, 253 U. S. 233, 64 L. ed. 878, 40 Sup. Ct. Rep. 499.

The pertinent question, now, Is the manner and method of this exercise of the sovereign power in such business and enterprise, and the status thereof, pursuant to statutory enactment?

In Bank of the United States v. Planters' Bank, 9 Wheat. 904, 6 L. ed. 244, the state of Georgia and certain citizens thereof were members of the Planters Bank. The question of jurisdiction over the state of Georgia as a party defendant was concerned. In the opinion rendered, Chief Justice Marshall, among other things, stated:

"It is, we think, a sound principle, that when a government becomes a partner in any trading company, it devests itself, so far as concerns the transactions of that company, of its sovereign character, and takes that of a private citizen. Instead of communicating to the company its privileges and its prerogatives, it descends to a level with those with whom it associates itself, and takes the character which belongs to its associates, and to the business which is to be transacted. Thus, many states of this Union who have an interest in banks are not suable even in their own courts; yet they never exempt the corporation from being sued. The state of Georgia, by giving to the bank the capacity to sue and be sued, voluntarily strips itself of its sovereign character, so far as respects the transactions of the bank, and waives all the privileges of that character. As a member of a corporation, a government never exercises its sovereignty. It acts merely as a corporator, and exercises no other power in the management of the affairs of the corporation than are expressly given by the incorporating act."

In Briscoe v. Bank of Kentucky, 11 Pet. 257, 9 L. ed. 709, an action was commenced by the Bank of the Commonwealth of Kentucky upon certain notes made payable to it, and the defense was raised that such notes were given to the bank through a loan of its bills, and that the same were illegal because they were bills of credit emitted by the state in violation of the United States Constitution. It appeared that this bank had been established in the name and in behalf of the commonwealth of Kentucky, under the direction of a president and twelve directors chosen by the general legislative assembly. That such bank was designated as a corporation, and was capable of suing and being sued. The stock of the bank was exclusively the property of the com-

monwealth, and it was constituted from moneys paid into the treasury for the purchase of vacant land and land warrants. The bank was authorized to receive moneys on deposit and to make loans. It appeared that no part of the capital had ever been paid into the bank. The contention was made that the character of the bank was changed by reason of the state of Kentucky being its exclusive stockholder; that this made the bank identical with the state, and the operations of the bank the operations of the state. It was held, following the decision in Bank of United States v. Planters' Bank, supra, that these contentions could not be upheld. That the bank was a simple corporation acting within the sphere of its corporate powers, and that it could no more transcend them than any other corporation, and that the state, as a stockholder, bears the same relation to it as any other stockholder; that the act creating the bank was a constitutional exercise of power of the state.

In Darrington v. Bank of Alabama, 13 How. 12, 14 L. ed. 30, an action was brought by the bank against the makers of a note payable to the bank, and the defense was that the note was given for bills of credit issued by the state. It appeared that the bank (at Mobile) was created by legislative act; that a president and fourteen directors were annually elected by the legislature; that the state was the only stockholder in the bank; that its capital stock was $2,000,000, procured from the sale of bonds of the state created for that purpose; the bank was authorized to exercise the ordinary powers of a banking corporation, and was further authorized to issue notes. The credit of the state was pledged for the ultimate redemption of such notes. It was contended that the state employed the bank as an agency through which its bills should be circulated for the profit of the state. It was held that the state as a stockholder received a profit, if any profit was realized, through the operation of the bank, and this was the condition of individual stockholders in all banks; that a state as a stockholder holds its property as an individual or corporation would hold it in the bank. It was further held that the liability of the state for its guaranty of the eventual credit of the notes of the bank by the state was a liability altogether different from that of the state on a bill of credit; that it was remote and contingent; that it could have been nothing more than a formal responsibility, if the bank was properly conducted, and that no one

received a bill of such bank with the expectation of its being paid by the state.

In Curran v. Arkansas, 15 How. 304, 14 L. ed. 705, it appeared that the bank of the state of Arkansas was incorporated by legislative act with the usual banking powers of discount, deposit, and circulation. That the state was its sole stockholder; that the capital stock of the bank consisted of $1,146,000 raised by the sale of state bonds and certain other sums. It was again held that a bank was a distinct trading corporation having a complete separate existence; enabled to enter into valid contracts by itself alone, and having specific capital stock, provided and held out to the public, as a means to pay its debts. That the obligations of its contracts, the funds provided for their performance, and the equitable rights of its creditors, were in no way affected by the fact that a sovereign state paid in its capital and consequently became entitled to its property. It further reaffirmed the principle that a state, by owning all of the capital stock, does not impart to that corporation any of its privileges or prerogatives; that it lays down its sovereignty and exercises no power or privilege in respect to those transactions not derived from the charter. Likewise, in Amstein v. Gardner, 134 Mass. 4, where a railroad and tunnel line was created and operated pursuant to legislative enactment subject to executive control and supervision, it was held, against the objection that the commonwealth could not be sued in its own courts without its consent, that the legislative act intended to give its consent that actions be maintained, and to assume the same responsibilities as ordinary railroad corporations were obliged to assume.

In Western & A. R. Co. v. Carlton, 28 Ga. 180, it was held that when a state embarks in an enterprise such as is usually carried on by individual persons, the company puts away its sovereign character, and is subject to like regulations as persons engaged in like enterprises.

In Gross v. Managers of World's Columbian Exposition, 105 Ky. 840, 43 L.R.A. 703, 49 S. W. 458, the Kentucky legislature created a board of managers for the World's Fair, giving to such board the power to erect a suitable building, maintain a restaurant, and employ necessary agents and employees. It appropriated $100,000 for such purposes. The plaintiff was employed by the board to operate the restaurant. He brought this action for failure of the board to comply with

its contract. Demurrer was filed upon the ground that the board was only the agent of the state, and so could not be sued. It was held that, although this board was an agency of the state, it nevertheless was vested with corporate powers, and in such capacity it might be sued just as any other corporation. The court stated:

"The rule is well settled that the state cannot be sued, and that the same protection is extended to the officers of the state. But this rule does not apply to a corporation created by the state for certain public purposes. If appellee was made by the acts referred to a corporation or a quasi corporation, we see no reason why it should be exempted from the rule allowing suits to be brought against corporations on contracts they have made. So the question is presented whether appellee was invested by the legislature with the character of a corporation or quasi corporation. It is not necessary that the thing created by the legislature should be named by it a corporation. Its character depends upon the powers given it, and not upon the name by which the legislature may call it." See also 36 Cyc. 919; note in 44 L.R.A.(N.S.) 226.

The fact that an agency is a public institution, or functions as an agency of the sovereign power, does not necessarily mean that its engagements are the direct engagements of the state, and that no assault by action may be made upon this agency by reason of the inhibition against suing a state without its consent. Note in 35 L.R.A.(N.S.) 243. The state may prescribe that such agency shall be subject to action, or it may create such powers and obligations for such agency that the right of action against it is implied from the status created. A county, a city, a township, or school district are agencies of the sovereign power, yet they may sue and be sued because they are created and treated as corporations. A department of the state government may sue or be subject to suit, dependent upon the nature of the powers conferred and liabilities imposed. Thus, the board of railway commissioners may bring an action in their own name, § 4735, Comp. Laws 1913; or, they may be sued. State ex rel. Lemke v. Chicago & N. W. R. Co. 46 N. D. 313, 179 N. W. 378; Mississippi R. Commission v. Illinois C. R. Co. 203 U. S. 335, 51 L. ed. 209, 27 Sup. Ct. Rep. 90; Reagan v. Farmers' Loan & T. Co. 154 U. S. 362, 38 L. ed. 1014, 4 Inters. Com. Rep. 560, 14 Sup. Ct. Rep. 1047; Smith v. Ames, 169

U. S. 466, 42 L. ed. 819, 18 Sup. Ct. Rep. 418; Prout v. Starr, 188 U. S. 537, 47 L. ed. 584, 23 Sup. Ct. Rep. 398; note in 44. L.R.A. (N.S.) 215. So, an action may be maintained by or against the State Workmen's Compensation Bureau. See chap. 162 (§§ 8–20) Laws 1919; North Western Teleph. Exch. Co. v. Workmen's Compensation Bureau, ante, 397, 182 N. W. 269. See 36 Cyc. 919.

It remains, therefore, to consider the status of the Bank of North Dakota as an agency of the sovereign power. The question is not whether the sovereign power of the state is engaged in the banking business, but rather the question concerns the status of such sovereign agency, when exercised in an engagement of a business or enterprise, pursuant to a constitutional and statutory enactment. In the light of the cases hereinbefore cited, it is very apparent that the status of a sovereign agency engaged in the banking business is to be distinguished from the sovereign state itself, particularly when the statutory enactment creates a specific agency for the exercise of this power in an enterprise upon certain prescribed limitations and liabilities. In what manner has the state of North Dakota created a particular status for the bank of North Dakota as an agency of the sovereign power engaged in the banking business?

The legislative act (Laws 1919, chap. 147) has created a bank with full banking powers. It has in effect constituted the Industrial Commission as a board of directors; it has established a capital for such bank. It has provided for the issuance of bonds of the state to provide such capital. These bonds, principal, and interest are to be paid out of the profits of the bank, if insufficient, otherwise, through the process of taxation. The act does not prescribe that the profits realized from such bank in operations shall be considered state funds for the purpose of distribution in governmental operation. Manifestly, the funds on deposit in such bank are not public funds of the state for disbursement in governmental operation, excepting as the same have been deposited by the treasurer of the state for such purposes. In State ex rel. Kozitzky v. Waters, 45 N. D. 115, 176 N. W. 913, the state auditor, in contending for the right to examine this bank, maintained that it was his duty under the law "to inspect, in his discretion, the books of any person charged with the receipt, safe-keeping, or disbursement of public moneys." Comp. Laws 1913, § 132 (14). This court held that the

matter was one of legislative intention; that the Bank Act (Laws 1919, chap. 147, § 23) had given this power to the state examiner. This court stated: "As a depositary of public funds, the Bank of North Dakota merely succeeds, under the law, to the functions of the private-ly-owned depositary banks. The Bank, while publicly owned, does have certain powers which have heretofore been exercised and enjoyed exclusively by privately owned banks." See State ex rel. Stearns v. Olson, 43 N. D. 619, 175 N. W. 714. Assuredly the deposits of counties and municipalities, as well as of private individuals, are not state public funds. Furthermore, the act specifically grants the power to such bank to sue and be sued the same as in any ordinary civil action, with all of the provisions of the Code of Civil Procedure applicable. It would appear, in the light of the principles above discussed, that this Bank Act in question has been drawn with intelligent discrimination in order to avoid constitutional objections that might be raised, if the state was directly engaged as the state in the operation of this bank. For it is plainly evident that serious constitutional objections by the operation and maintenance of this bank might be raised if the Bank of North Dakota should be treated as the state itself, and be subjected to the constitutional provisions concerning the creation of indebtedness either present or future, and the limitations of indebtedness prescribed in the Constitutions.

The fact that the act (§ 10) provides that all deposits in the bank are guaranteed by the state does not show an intention that the operation of the bank is the direct engagement of the state as such. Darrington v. Bank of Alabama, 13 How. 12, 14 L. ed. 30. Rather does it disclose an intention to create a distinct status for the bank apart from the status of the state itself. This is further emphasized by the fact that a capital fund is provided for the bank. That its profits in its operation are neither prescribed nor considered public funds, but are carried as profits or surplus of the bank for purposes of its business apart from the state's public funds; and that the specific right is granted to maintain actions on account of the bank's transactions. It is unnecessary to define the status of such bank as that of a corporation. It is sufficiently seen that, as an agency of the sovereign power, it possesses a status distinct and separate from that of the state itself, a status of a state enterprise circumscribed by and dependent upon, the rights, powers, and liabilities created by a specific statutory enactment.

*Right to Avail of Garnishment.*—The act (§ 22) by its specific terms provides that civil actions may be commenced on account of trans-actions connected with the bank; that such actions may be brought in the same manner and shall be subject to the same provisions of law as other actions brought pursuant to the Code of Civil Procedure. The complaint in this action seeks to recover moneys that the county has deposited in the Bank of North Dakota. It seeks to recover its own funds. It does not seek to lay hold upon state public funds, or to re-cover a judgment therefor. Again, it does not seek to impair the state sovereignty or state public funds. A garnishment proceeding in this state is entirely separate and distinct from either attachment or execu-tion. Park, Grant & Morris v. Nordale, 41 N. D. 351, 170 N. W. 555. It creates no specific lien. It seeks to hold a garnishee to a per-sonal liability. 20 Cyc. 978. The measure of this liability is depend-ent upon the defendant's right to recover against the garnishee. F. B. Scott Co. v. Scheidt, 35 N. D. 433, 160 N. W. 502; Shortridge v. Sturdivant, 32 N. D. 154, 155 N. W. 20. The process of garnishment is an action subject to the provisions of law relating to provisions in civil actions applicable; a judgment may be rendered against a gar-nishee. Comp. Laws 1913, § 7581. Park, Grant & Norris v. Nor-dale, and F. B. Scott Co. v. Scheidt, supra. Such garnishment action is within the provisions of the Code of Civil Procedure mentioned in § 22 of the Bank Act. This proceeding seeks to recover a personal judg-ment against the garnishee banks. It is not a garnishment proceeding in aid of execution, and it is clear that § 8177, Comp. Laws 1913, which relates to execution, has no application to the present garnishment pro-ceeding.

So far as public funds are involved, whether state or county, by rea-son of the deposits made in the Bank of North Dakota and the rede-posits made by the Bank of North Dakota in the various garnishee banks, no difficulties are necessary to be considered or anticipated in the adjustment of the personal liability of the Bank of North Dakota to the county and its transfer, by the garnishment process, to a personal liability against the various garnishee banks. In this process it is wholly unnecessary to predicate any impairment of public funds in the resulting processes necessary to adjust the respective liabilities. It is accordingly the opinion of this court that, through the plain provisions

of § 22 of the Bank Act, garnishment process as herein instituted is available in an action against such bank.

The order is affrmed.

Robinson, Ch. J., and Birdzell and Christianson, JJ., concur.

Robinson, Ch. J. The plaintiff sues to recover a balance of $50,000 deposited in the defendant bank, and to secure recovery of the same garnishees the First National Bank of Forman and others. Defendant moves to vacate the garnishment on the grounds that the funds due it from the other banks are not subject to garnishment, and because it is a part of the sovereign state, and not a corporate entity. The appeal is from an order refusing to vacate the garnishment.

The defendant bank is under the control of an Industrial Commission, viz., the governor, attorney general, and commissioner of agriculture, and, under the bonding act, the state has issued to the commission "Bonds of North Dakota, Bank Series" to the amount of $2,-000,000, with interest at 6 per cent, payable semi-annually. The commission is authorized to sell the bonds, and the moneys derived from the sale do constitute the capital of the bank. And from time to time the bank must pay to the state treasurer such moneys as may be available for the payment of such bonds and interest. Laws 1919, chap. 148. Thus the state does start the bank in business with a loan of $2,000,000, to be paid as funds become available. By its charter or the act of its organization the business of the bank must be conducted in the name of "The Bank of North Dakota."

"Civil actions against the bank must be brought against it in the name of the State of North Dakota, Doing Business as the Bank of North Dakota."

"And service of process therein shall be made upon the manager of the bank." "Such actions may be brought in the same manner and shall be subject to the same provisions of law as other civil actions brought pursuant to the Code of Civil Procedure. Laws 1919, chap. 147, § 22.

By this act it is provided that all state, county, township, or municipal funds shall be deposited in the Bank of North Dakota, and that any

47 N. D.—37.

person having control of public funds and failing to make such deposit shall be guilty of a misdemeanor. That compulsory deposit feature is not constitutional, and it has been repealed by a vote of the people.

Those acts were prepared at a time when certain persons known as League Managers were in absolute control, and when the League had a two-thirds majority in each House. Doubtless they expected to retain control for many seasons, and to use the bank as a political asset. Certainly there was a purpose to control both the bank and the affairs of state. The Bank Act declares it is the purpose of the state to engage in the banking business, and to establish a system of banking operated by the state. But the legal maxim is that particular expressions control those that are general. The whole act shows that its purpose was to create a corporate entity, to conduct a banking business under the patronage of the state. The bank was organized as a corporate entity to do business as a bank in its own name, and to repay the state for the bonds issued to it as capital. The bank was given a right to receive deposits and to incur debts without limit, and it is provided that all deposits in the Bank of North Dakota are hereby guaranteed by the state. Clearly that guaranty is not constitutional, because, under it, the state would incur unlimited liability. The state may not assume or guarantee bonds or debts in excess of $2,000,000 unless well secured by mortgages upon real estate or some property of the state-owned utilities. Even then the issue or guaranty must not exceed $10,000,000. Const. § 182, art. 31. Thus it is manifest the state is one thing and the bank is another. The bank is not the state or a political subdivision of the state. It is a corporate entity, and as such it may contract, sue, and be sued, and receive deposits to an unlimited amount. It is vain to contend that it may contract, receive deposits, withhold the same, set the depositors at defiance, and claim exemption from the ordinary process of law.

By the Constitution every person is entitled to a remedy by due process of law for all wrongs done him in his person or property. When the bank receives deposits and refused to repay the same, it does the depositors a manifest wrong, for which there must be a remedy by due process of law. The ordinary remedy is by suit to recover a judgment and by execution, attachment, or garnishment to secure or satisfy the judgment. In this case the plaintiff brings suit and serves garnishee

process on parties owing the defendant bank. By that means it says to the garnishees: The bank owes me. You owe the bank, and you must pay the debt to me and that will release you from all liability. The process is the simplest or least expensive of all legal remedies. Counsel for the bank object to the remedy without attempting to show that its creditors have any other or better remedy. Certainly there is another and a far more drastic remedy, which is to force the defaulting bank into liquidation by the appointment of a receiver; but that is considered a last resort, and of course the bank does not insist on it.

Now it seems hardly credible that a great state bank should receive deposits amounting to millions of dollars, and set its depositors at defiance, claiming that it is exempt from due process of law. Yet it is not the first time that such claims have been made and denied. That sufficiently appears from the cases cited in the other opinions. Thus, by the United States Supreme Court, it is held that, a state by becoming interested in a corporation and by owning all the capital stock, does not impart to the corporation any of its privileges or prerogatives; that it lays down its sovereignty so far as respects transactions of the corporation. Curran v. Arkansas, 15 How. 308, 14 L. ed. 707.

In cases of this kind, as it appears from reason and authority, neither the state nor a corporate entity may play pig and puppy, or blow hot and cold, at the same time. In law a party must be consistent. No man can take advantage of his own wrong. No one should suffer from the acts of another. The law respects form less than substance. For every wrong there is a remedy. Now what is the remedy when the great Bank of North Dakota flatly refused to refund the money due to its depositors? That is the real question in this case. Counsel for the bank have made no attempt to answer it, because they cannot point to a remedy less drastic than garnishment. There is no claim that the only proper remedy is to put the defaulting bank into the hands of a receiver. There can be no claim that the bank may trifle with the administration of justice or repudiate its just debts.

It may be well to note that in this proceeding the plaintiff can assert no claim against the garnishee, except that which might have been asserted by the defendant bank. In its last report defendant counts among its resources nearly $5,000,000 for redeposits in 785 banks. The inference is that as a matter of bookkeeping, or in some way, the

defendant has received from the banks $5,000,000, and charged them back with a redeposit of their own money, so that one deposit may cancel the other. In other words, if a bank gets for its deposit nothing only a credit mark, and is charged with a redeposit of its own money, then one deposit offsets the other, and, except for a balance of the account neither party has a cause of action. There is no magic in words, figures, or bookkeeping that can charge a bank and make it liable for a redeposit of its own deposit.

The order refusing to vacate the garnishment is affirmed.

GRACE, J. (dissenting). This is an appeal from an order overruling a motion to vacate a garnishment proceeding. The action is one brought against the state of North Dakota, in which the plaintiff seeks to recover a judgment of approximately $125,000, for deposits of money made in the Bank of North Dakota.

The plaintiff, at the time of bringing the action, instituted garnishment proceedings against seventeen national and state banks, wherein it is claimed that the State of North Dakota, Doing Business as the Bank of North Dakota, had redeposited certain funds.

The defendant, the state of North Dakota, interposed an answer to the garnishment proceedings, wherein it charged the garnishment affidavits were false and untrue; that the garnishment summons was issued in violation of § 8177, Comp. Laws 1913, and that the same is illegal and void, and that all the property held by the garnishees, belonging to the defendant, is absolutely exempt from execution.

The defendant then moved to dismiss such garnishment proceedings, upon grounds contained in the answer, which motion was denied by the trial court.

This case is manifestly one of great importance, and should receive the earnest, serious, careful, and conscientious consideration of each member of this court. The majority opinion, if it shall eventually become final, strikes down every state-owned industry and utility heretofore brought into existence, in consonance with certain provisions of our State Constitution, and laws enacted under the authority and in pursuance thereof. It strikes down not only the Bank of North Dakota, exclusively owned and operated by the state, but the reasoning therein as well strikes down the state-owned industries of mills and

elevators, and the state-owned-and-operated Home Building Association; and this, as we firmly are impressed and believe, in direct violation of certain provisions of the Constitution, and certain laws enacted in pursuance thereof, hereafter to be particularly mentioned.

The majority opinion, at its very threshold, states that "two fundamental, legal questions are involved: First, the status of the Bank of North Dakota; and, second, the right to avail of garnishment process in a proceeding against it."

Thus, at the very inception of the decision, we find an erroneous premise, which consists in the claim that one of the fundamental, legal questions involved is the "status" of the Bank of North Dakota. There is no such question involved in this case. The real questions involved in this case are: First, the status of the State of North Dakota; and, second, the right to avail of garnishment process in a proceeding against the State of North Dakota.

It is only by the erroneous premise assumed in the first question, as stated in the majority opinion, that made it possible for the writer of that opinion to proceed to deliver himself of the thoughts contained therein. By assuming the erroneous premise, he was able to write something which at first glance may appear plausible, but upon serious consideration will be found to have no merit.

Having assumed an erroneous premise, there could be but one result, and that is, to reach an erroneous conclusion.

The first question to be decided is, whether the State of North Dakota, in its sovereign capacity, is engaged in the banking business, or whether the Bank of North Dakota, as a separate and distinct corporate entity, is thus engaged. We must determine, at the outset, whether, in the conduct of the business of the Bank of North Dakota, the state of North Dakota is functioning in its sovereign capacity, or whether it has loaned its credit, its money, its resources, to a separate entity or corporation, engaged in a private business or undertaking.

The principal contention or claim of the majority opinion is that the Bank of North Dakota is engaged in private business; that in effect it is a private corporation, and, as such, may sue and be sued. What is claimed in this regard in reference to the Bank of North Dakota, if such claim is well founded, applies with equal effect to the state-owned mill and elevator, and to the Home Building Association.

Section 185 of our Constitution, as the same was drafted by the members of the Constitutional Convention, and as it became a part of our Constitution, reads thus:

"Neither the state nor any county, city, township, town, school district or any other political subdivision shall loan or give its credit or make donations to or in aid of any individual, association or corporation, except for necessary support of the poor, nor subscribe to or become the owner of the capital stock of any association or corporation, nor shall the state engage in any work of internal improvement unless authorized by a two-thirds vote of the people."

For more than twenty-five years the farmers of this state, agricultural interests, and producers incessantly carried on an agitation for state-owned mills and elevators and other state-owned utilities and industries. Finally it came to pass that the people, in their sovereign capacity, and in the exercise of their elective franchise, determined that the state should engage in its sovereign capacity in industry, enterprise, and business on its own account, and the people in their sovereign capacity, having so determined, it became necessary to amend § 185, and it was amended, and is referred to in the majority opinion as article 32. It reads thus:

"Section 185 in article 12 as amended by article 18 of amendment. The state, any county or city may make internal improvements and may engage in any industry, enterprise or business not prohibited by article 20 of the Constitution (provision with reference to prohibition), but neither the state nor any political subdivision thereof shall loan or give its credit or make donations to or in aid of any individual, association or corporation, except for reasonable support of the poor, nor subscribe to or become the owner of capital stock in any association or corporation."

The effect of this amendment is to authorize the state, in its sovereign capacity, to engage in any industry, enterprise, or business not prohibited by article 20 of the Constitution. But, as will be seen from a reading of § 185 as amended, it still prohibits the state, or any political subdivision thereof, from loaning or giving its credit, or from making donations in aid of any individual, association, or corporation, which, of course, means any individual, association, or corporation engaged in a private business. Neither can the state, nor any political

subdivision, subscribe to or become the owner of any capital stock of any such association or corporation.

Now, one of two propositions must follow. Either the state, in its sovereign capacity, has, in pursuance of the authority contained in § 185 as amended, engaged in industry, enterprise, or business, or it has loaned its credit, money, and made donations to an individual, or an association, or corporation, engaged in the conduct of a private business, such as the majority opinion claims the Bank of North Dakota to be.

Now, if the state of North Dakota has not engaged in business in its sovereign capacity, it has loaned its credit, or money, or made donations to the extent of $2,000,000, to the Bank of North Dakota, which, according to the majority opinion, is engaged in private business, the same as any other corporation, and liable as such to sue and be sued.

If this were true, which it certainly is not, than the loaning or giving of money, or making donations to the Bank of North Dakota, in the manner it has been done, would be a direct violation of § 185 as amended, which prohibits the state from loaning or giving its credit, making donations to individuals, associations, or corporations which are engaged in private business.

Can it be claimed that the people of the state of North Dakota, acting in their sovereign capacity, and exercising the sovereign right of elective franchise, were so foolish, or so simple, as to go to all the expense and trouble of amending § 185 of the Constitution, so as to permit the state to engage in any industry, enterprise, etc., if they were not thereafter to act under that section as amended, if they acted at all?

Did they do all of this, and then afterwards convene in their legislative capacity, through their representatives, and pass laws and make appropriations to private corporations, such as the Bank of North Dakota is by the majority opinion claimed to be, the only result of which was to violate § 185, which prohibits the loaning or giving of the state's credit to private corporations? Most certainly not. What the state of North Dakota has done, under § 185 as amended, permitting it to engage in industry and business, it has done in its sovereign capacity, and has established in that capacity a banking business; operated, owned, and controlled by the state, the mill and elevator

business, and the Home Building Association, owned, operated, and controlled by the state, in its sovereign capacity.

To prove this more conclusively, and to ascertain the intent of the legislature in this regard, it is not only necessary to examine and consider the contents of chapter 147 of the Session Laws of 1919, but, as well, those chapters which establish the mill and elevator business, and the Home Building Association, and the chapter which establishes the Industrial Commission, and from all of these may we draw the intent and purpose of the state to engage in business in its sovereign capacity.

Section 1 of chapter 147 reads thus: "For the purpose of encouraging and promoting agriculture, commerce, and industry, *the state of North Dakota shall engage in the business of banking, and for that purpose shall, and does hereby, establish a system of banking owned, controlled and operated by it, under the name of the Bank of North Dakota.*"

The title of the act reads thus: "*An Act Declaring the Purpose of the State of North Dakota to engage in the Banking Business and Establish a System of Banking under the Name of the Bank of North Dakota, operated by the State, and Defining the Scope and Manner of Its Operation, and the Powers and Duties of the Persons Charged with Its Management;* making an appropriation therefor; and providing penalties for the violations of certain provisions thereof."

From the language of the title and that contained in § 1, can there be the the least doubt in any fair or reasonable mind, that the state of North Dakota, in its sovereign capacity, is engaged in the banking business? It is the duty of this court to construe and interpret laws and constitutional provisions. We say that, under any fair construction, after even a glance at the above plain and clear statement of the purpose of the state of North Dakota to engage in the banking business, no other conclusion is even remotely possible than that it has been, and is, in its sovereign capacity engaged in the banking business.

The purpose of the state of North Dakota to engage, in its sovereign capacity, in the business of banking, is again reasserted in § 3 of chapter 148 of the Laws of 1919, which is an act providing for the issuing of the bonds of the state of North Dakota, in the sum of $2,000,000, which the state is to use as its capital in conducting its banking business.

Section 3, so far as material to the purpose of showing the intent of the state of North Dakota to engage in the banking business, reads thus: "The said issue of bonds is authorized for the purpose of making delivery thereof to the Industrial Commission of North Dakota as hereinafter provided, and as contemplated by section six (6) of the act entitled 'An Act Declaring *the Purpose of the State of North Dakota to Engage in the Banking Business* and Establishing a System of Banking under the Name of the Bank of North Dakota, *operated by the State,* and Defining the Scope and Manner of its Operation, etc.' "

To determine more clearly that the state of North Dakota is engaged in all the various kinds of business above mentioned, we will briefly consider part of chapter 150 of the Session Laws of 1919. The title of that act reads thus: "An Act Declaring *the Purpose of the State of North Dakota to Engage in the Enterprise of Providing Homes for Residents of this State, and to That End to Establish a Business System Operated by the State, under the name of the Home Building Association of North Dakota,* and Defining the Scope and Manner of Its Operation, and the Powers and Duties of the Persons Charged with Its Management; and Making an Appropriation Therefor."

Section 1 of that act reads thus: "For the purpose of promoting home building and ownership *the state of North Dakota shall engage in the enterprise of providing homes for* residents of the state, and to that end *it* shall, and does hereby, establish a business system *operated by the state,* under the name of the Home Building Association of North Dakota, hereinafter for convenience called the Association."

Section 15 of the same act provides that "all business of the Association may be conducted under the name of 'The Home Building Association of North Dakota.' *Title to property* pertaining to the operation of the Association shall be obtained and conveyed in the name of the 'State of North Dakota, Doing Business as the Home Building Association of North Dakota.' *Written instruments shall be executed in the name of the state of North Dakota, signed by any two members of the Industrial Commission of whom the governor shall be one, or by the manager of the Association, within the scope of his authority so to do as defined by the Industrial Commission.*"

The same provision with reference as to the execution of written instruments, and as to who shall execute them, is contained in the act establishing the Bank of North Dakota.

We shall also consider chapter 152 of the Session Laws of 1919, to determine if the state, in its sovereign capacity, is engaged in business. This act relates to the conducting of the state-owned mills and elevators. The title of the act reads thus: "An Act Declaring *the Purpose of the State of North Dakota to Engage in the Business of Manufacturing and Marketing of Farm Products* and for *Establishing* a Warehouse, Elevator, and Flour Mill *system* under the Name of the North Dakota Mill and Elevator Association *Operated by the State,* and Defining the Scope and Manner of its Operation, and the Powers and Duties of the Persons Charged with Its Management; and Making an Appropriation Therefor."

Section 1 of the act provides "that, for the purpose of encouraging and promoting agriculture, commerce, and industry, *the state of North Dakota* shall engage in the business of manufacturing and marketing farm products, and for that purpose shall establish a system of warehouses, elevators, flour mills, factories, plants, machinery and equipments, *owned, controlled, and operated by it* under the name of North Dakota Mill & Elevator Association, hereinafter for convenience called the Association."

Can any reasonable or unprejudiced mind, for a single instant, maintain that anything else is intended by the above language than that *the state of North Dakota, in its sovereign capacity,* is engaged in the mill and elevator business, and in the marketing and manufacturing of farm products, etc. ?

Section 2 of chapter 153 of the Session Laws of 1919, which is an act providing for the issuing of bonds of the state of North Dakota, for the purpose of procuring money by the state, to conduct its mill and elevator business, owned and operated by it, recites in § 2 thereof, the title of chapter 152.

So, also, chapter 154 of the Session Laws of 1919, which provides for the bonds of North Dakota, Real Estate Series, and in § 2 recites the title to the act which is chapter 147.

We now turn to chapter 151 of the Session Laws of 1919, the act creating the Industrial Commission. It is entitled "An Act Creating the *Industrial Commission of North Dakota,* Authorizing *It* to Conduct and Manage *on Behalf of the State* Certain Utilities, Industries, Enterprises, and Business Projects, and Defining Its Powers and Duties; and Making an Appropriation Therefor."

Section 1: "A commission is hereby created and established *to conduct and manage, on behalf of the state of North Dakota,* certain utilities, industries, enterprises, and business projects, now or hereafter established by law. It shall be known as the Industrial Commission of North Dakota, but may be designated as the Industrial Commission."

Section 2: "The Industrial Commission shall consist of three members, namely, *the governor, the attorney general, and the commissioner of agriculture and labor, of the state of North Dakota, etc."*

Section 3, so far as material here, reads: *"The governor* shall be the chairman of the Industrial Commission, and its attorney shall be the *attorney general of the state."*

Section 4: "The Industrial Commission shall adopt and procure an *official seal,* and may authenticate therewith its documentary acts. All orders, rules, regulations, by-laws, and written contracts, adopted or authorized by the commission, shall, before becoming effective, be approved by the *governor* as chairman, and shall not be in force unless approved and signed by *him."*

Section 5: "The Industrial Commission is hereby empowered and directed to manage, operate, control, and govern all utilities, industries, enterprises, and business projects, now or hereafter established, owned, undertaken, administered, or operated by the *state of North Dakota,* except those carried on in *penal, charitable, or educational institutions.* To that end it shall have the power, in the exercise of its sound judgment, and is hereby directed:

"(a) To determine the locations of such utilities, industries, enterprises, and business projects.

"(b) *For the state and in its name and behalf,* in order to accomplish the purposes of this act, to acquire by purchase, lease, or by exercise of the right of eminent domain, as provided by chapter 36 of the Code of Civil Procedure, Comp. Laws of 1913, all necessary properties and property rights, and to hold and possess or to sell the whole or any part thereof; to construct and reconstruct necessary buildings thereon; to equip, maintain, repair, and alter any and all such properties and the improvements thereon; and generally to use the same so as to promote such utilities, industries, enterprises, and business projects.

"(c) To appoint a manager, and all necessary subordinate officers

and employees, of and for each such utility, industry, enterprise, and business project; to constitute any such manager its *general agent* in the performance of *its* duties in *the particular utility, industry, enterprise, or business project* in which he shall be engaged, but subject, nevertheless, in such agency to the supervision, limitation, and control of the commission. . . .

"(h) To conduct investigations of all matters directly or indirectly connected with, or bearing upon, the success of any of the utilities, industries, enterprises, and business projects under its management, and of all matters which may directly or indirectly affect the methods, operations, processes, products, or results thereof. In aid of any such investigation, the Commission shall have the power to *summon and compel* the attendance of witnesses, and to examine them under oath, which any member thereof shall have the power to administer. It shall have access to, and may order the production of, all books, accounts, papers, and property, material to such investigation. Witnesses, other than those in the employ of the state, shall be entitled to the same fees as in civil cases in the district court. The claim that any *testimony* or *evidence* sought to be elicited or produced on such examination may tend to *criminate* the person giving or producing it, or expose to public ignominy, *shall not excuse him from testifying or producing evidence documentary or otherwise; but no person shall be prosecuted or subjected to any penalty or forfeiture for and on account of any matter or thing concerning which he may testify or produce such evidence;* provided, that he shall not be exempted from prosecution and punishment for perjury committed in so testifying."

In view of all these provisions, can it be successfully asserted or contended, or is there a shadow of reason for doing so, that all or either of the industries above mentioned are not conducted by the state of North Dakota in its sovereign capacity? Can any other intent or purpose be deduced from the foregoing constitutional provisions or laws?

Every member of this court, with the exception of Justice Christianson, not longer since than January 2, 1920, concurred in the decision of Green v. Frazier, 44 N. D. 395, 176 N. W. 11, wherein it was held that the establishment of all the above state industries, the proceeds of the bonds issued or proposed to be issued to establish and carry on the above industries, were to be used for a public purpose,

by the sovereign power, the state, for the promotion of the general welfare of all the people of the state.

This court there said: "It must be kept in mind, also, that the 'Bank of North Dakota' and 'Mill & Elevator Association,' and all other agencies established by the state, for the purpose of operating the state industries in question, are not private corporations or private agencies, but are, so to speak, arms of the sovereign power, the state, reaching out to execute its mandates. When the Bank of North Dakota functions, it does so as an agency of the sovereign power of the state, in like manner as the treasurer of the state of North Dakota. The same is true of every other state industry which is the subject of this controversy."

We further said there: "Under § 185 of the Constitution of the state of North Dakota, as amended, which was submitted to the people at an election, and by the votes of the majority of the voters voting at such election duly adopted, and which constitutional amendment has legally become a part of the organic law of this state, and is now in full force and effect, the state is *duly authorized and empowered to establish and operate state-owned elevators and mills.* The legislature has enacted into laws the laws in question, establishing these state-owned utilities, under and by virtue of such constitutional authority. *Not only were such laws duly enacted by the legislature of this state, but, after being enacted, under the initiative and referendum provisions of the Constitution, they were each and all referred to the people for their approval, and at a general election each of said laws were again approved by the majority of the electors voting thereon."*

In the case of State v. Taylor, 33 N. D. 76, L.R.A.1918B, 156, 156 N. W. 561, Ann. Cas. 1918A, 583, the following principles of law are declared in the syllabus: "Wisdom, necessity, or expedience of legislation, are matters for legislative, and not judicial, consideration. The object of all statutory interpretation and construction is to ascertain and give effect to the intention of the legislature."

We further said in the Green v. Frazier case: "The creating and constituting of the Bank of North Dakota in the manner above set forth, the authorizing of $5,000,000 mill and elevator bonds, and the $10,000,000 bonds of North Dakota, real-estate series, are each and all acts intended to stimulate the production of and the caring for the

marketing of wheat and other small grains in the state of North Dakota, and *that* is held to be a public use, to effectuate which a tax may be levied and collected, and we so determined and decided. Each and all of said bond issues are in accord with the provisions of the Constitution in question, and laws of the state of North Dakota, *and we so hold.*"

In the case of Scott v. Frazier, 258 Fed. 678, Honorable Charles F. Ammidon, District Judge, recognized that all the above industries were state owned and operated, and that, largely, the purpose of the establishment of the various enterprises was public, and for public enterprises, owned and operated by the state of North Dakota.

The case of Green v. Frazier, supra, the opinion in which was written by the writer hereof, was appealed to the Supreme Court of the United States, and was, by that high court, affirmed, and here let us inquire, Upon what principle does their decision rest? It seems that all of the state-owned industries above mentioned, including the Bank of North Dakota, were established for a public purpose. If the United States Supreme Court had not thus held, it could not have affirmed the decision in that case; for, if the above industries were businesses, or private corporations, or in the nature of private corporations, as is in effect maintained in the majority opinion, then the state of North Dakota would have no authority or power, either under the state or Federal Constitution, to impose taxes upon property for a private purpose. The Supreme Court of the United States, in the case of Green v. Frazier, 253 U. S. 233, 64 L. ed. 878, 40 Sup. Ct. Rep. 499, in an able opinion written by Mr. Justice Day, said: "The due process of law clause contains no specific limitation upon the right of taxation in the states, but it has come to be settled that the authority of the states to tax does not include the righ to impose taxes for merely private purposes." Fallbrook Irrig. Dist. v. Bradley, 164 U. S. 155, 41 L. ed. 387, 17 Sup. Ct. Rep. 56. That court further said, quoting from the Fallbrook Case: "In the 14th Amendment, the provision regarding taking of private property is omitted, and the prohibition against the state is confined to its depriving any person of life, liberty, or property, without due process of law. It is claimed, however, that the citizen is deprived without due process of law, if it be taken by or under state authority for other than a public use, either under

the guise of taxation, or by the assumption of the right of eminent domain. In that way, the question of whether private property has been taken for any other than a public use becomes material in this court, even where the taking is under the *authority of the state,* instead of the Federal government." See Fallbrook Irrig. Dist. v. Bradley, supra. "In the present instance, *under the authority of the Constitution and laws prevailing in North Dakota, the people, the legislature, and* the *highest court* of the state, have declared the purpose for which these several acts were passed to be of a *public nature,* and within the taxing authority of the state. With this united action of *people, legislature,* and *court,* we are not at liberty to interfere, unless it is clear, beyond reasonable controversy, that rights secured by the Federal Constitution have been violated."

The Supreme Court of the United States further said that the precise question involved in the Green v. Frazier case had never been presented to that court, stating that the nearest approach to it is found in Jones v. Portland, 245 U. S. 217, 62 L. ed. 252, L.R.A.1918C, 765, 38 Sup. Ct. Rep. 112, Ann. Cas. 1918E, 660.

The Supreme Court of the United States recognized that the purpose of our state-owned-and-operated utilities is a public one, and contrasted the principle of a public use and public institutions with private institutions.

It further said, in the Green v. Frazier case: "This is *not a case* of undertaking to aid *private institutions* by public *taxation,* as was the fact in Citizens' Sav. & L. Asso. v. Topeka, 20 Wall. 665, 22 L. ed. 455. In many instances *states* and *municipalities* have in *late years* seen fit to enter upon projects to promote the public welfare which in the past have been considered entirely within the domain of private enterprise."

It has been definitely stated by this supreme court (North Dakota) in no uncertain or doubtful terms, but with great certainty, that, under the constitutional provisions and laws passed in pursuance thereof, the utilities and industries above mentioned are state owned and operated by the state of North Dakota, in its sovereign capacity, and for a public purpose. See Green v. Frazier, 44 N. D. 395, 176 N. W. 11.

The people of the state, in the exercise of their sovereign powers, and in the exercise of their elective franchise, at the time of the adop-

tion of § 185 as amended, construed such anticipated state industries and utilities to be state owned and operated by the sovereign power of the state, and in its sovereign capacity.

A like construction by the legislature has been placed upon all the laws enacted for the purpose of establishing and carrying on all of such industries. A like construction has been placed upon all of such laws, when each of them were referended and ratified by the people in the most solemn discharge of their elective franchise, at a regular election called to vote upon those measures. It is the common understanding and the common knowledge of every lay person in this state, and in every other state, and of the press, both within and without the state, and every business interest, whether agricultural, commercial, or banking, that these industries are owned and operated by the state, in its sovereign capacity.

Large amounts of money have been, and are to be, invested in them, on the theory that they are state operated and owned, and that they were established for a public purpose and a public use, and that they are in no way private businesses or agencies.

Let us now hear from our venerable Chief Justice, The Honorable J. E. Robinson, in reference to whether the above industries and utilities are owned, controlled, and operated by the state. He expressed himself very fluently in the case of State ex rel. Langer v. Hall, 44 N. D. 536, 173 N. W. 763. In that case, the secretary of state refused to certify to the $2,000,000 of bonds of bank series, one of the grounds for refusal being that there, at that time, existed $412,000 of bonded indebtedness of the state of North Dakota. The $2,000,000 there in question were to be the capital of the state of North Dakota, in the operation of the Bank of North Dakota.

But let us listen to our venerable colleague. He first quoted the constitutional amendment, permiting the state to issue or guarantee the payment of bonds, provided that all bonds in excess of $2,000,000 should be secured by first mortgages upon real estate, etc. He further said:

"On this amendment the vote was: Yeas, 46,000; nays, 34,000. *On the amendment for public ownership the yeas were 47,000, nays, 32,000.* On the amendment for initiative and referendum, the yeas were 50,000 and the nays 31,000. Under those amendments *the state*

is free to issue bonds and to pursue *any industry. . . .* Under the *old* law the state was prohibited from engaging in any industry or enterprise, and accordingly the power to contract debts was limited to the small sum of $200,000, but under the *new amendment* the old *limitations* and *hamperments* are no more. Now *the state and any county or city may engage in any industry, enterprise, and business.* And as no limitations are placed on the manner of doing any business, of course the *state* may adopt the usual business methods, which include the borrowing of money, and the adaptation of means to ends. The amendments which permit and invite the state, *which make it the duty of the state to engage in business enterprises, must be liberally construed all together, so as to impose no handicaps on the state. It must be entirely free to adopt every means and method which may be necessary to business success.* The state and the several counties and cities are *public corporations* with large capital and credit. Thus far they have existed as *big nurslings* by pursuing the *feudal system* of levying taxes on the people and then squandering the public money. *Now,* the public corporations are invited to do business to make their own *expenses,* and a *profit* for the citizens or *stockholders* the same as all *private corporations* do. With all its capital and credit, if the state *cannot learn* to make its own expenses and a profit for its citizens, it does not deserve to exist. At the next election, there should be submitted a constitutional amendment prohibiting all further taxation, except it becomes necessary for the payment of the bonds. It is *high time* for the people to throw off the *yoke of bondage* and *feudalism."*

The opinion in the case of State ex rel. Langer v. Hall, supra, was written by the writer hereof. It was concurred in by Mr. Justice Birdzell and Mr. Justice Robinson, and was signed by Mr. Justice Bronson.

We think there are several other cases which have been before this court, wherein the majority of the court have either dirctly or indirectly held that all the above industries are owned and operated by the state, in its sovereign capacity. But we cannot take the time to examine them. Neither can we quote from every case, as that would make this opinion too extended.

One of the principal contentions in the majority opinion is that all

47 N. D.—38.

the above state industries, including the bank, are corporations, or quasi corporations. It refers to the Industrial Commission, as corresponding to directors of the bank. It seeks to show that the Bank of North Dakota is a private corporation, claiming that it can sue and be sued, the same as any other private corporation, but this is a matter with which we take direct issue, and will directly discuss when we come to consider § 22 of chapter 147.

The majority opinion seeks to show an analogy between the state of North Dakota, Doing Business as the Bank of North Dakota and a private corporation operating for gain, and then endeavors to apply the authority cited in the opinion. In other words, the opinion lays an incorrect premise, and then applies decisions of the Supreme Court of the United States, in an effort to sustain that incorrect premise.

We will try, in a few words, to point out the incorrectness of that premise, and to entirely destroy the alleged analogy of these state-owned industries to private corporations.

The same reasoning that applies to the bank of North Dakota applies to every other state-owned industry. If the Bank of North Dakota is a private corporation, or a quasi private corporation, then it must be authorized under some act authorizing its incorporation, or it must have been created a corporation by legislative act. We most sincerely maintain that neither of those conditons inhere in the creation of the Bank of North Dakota. Furthermore, if the Bank of North Dakota is a private corporation, or a quasi private corporation, it must possess the attributes of a private corporation.

The Bank of North Dakota has no president, vice president, or directors, or officers, of any kind or character, such as are necessary and indispensable in a private corporation. The Bank of North Dakota has no corporate seal, and, as is well known to all of us, a private corporation cannot act unless it possesses a corporate seal. It cannot act unless it acts through its officers. A private corporation must have stockholders. It must have capital stock, divided into shares. It must be capable of suing and being sued. It must be capable of executing instruments under its seal. This applies to all private corporations, unless organized for charitable and religious purposes, etc.

Now, the Bank of North Dakota, or any of the other state-owned industries, possess not a single one of these requirements, attributes, or

powers. It has no stockholders, no officers, no president or vice president, no capital stock divided into shares, and no capital stock in the sense that that term is generally understood and as applied to private corporations, but its capital stock, the $2,000,000, belongs to the state; for it is the state of North Dakota that is engaged in the banking business. It has no corporate seal. It cannot execute any instruments. No individual can receive any direct profit from the operation of the Bank of North Dakota, but only such benefit as is common to every other citizen of the state.

The purpose of the Bank of North Daktoa is public benefit not private gain. How is it operated? By the Industrial Commission. Who is the Industrial Commission? The governor, the commissioner of agriculture and labor, and the attorney general, each in execution of their duties, representing the sovereignty of the state. Are they conducting, on behalf of the state, only the Bank of North Dakota? No. They are the identical officers, acting in their sovereign capacity, who operate and manage for the state every other state-owned and operated industry; state-owned mills and elevators; the Home Building Association, etc.

By the act creating the Industrial Commission, their powers and duties are defined. Do they receive any additional pay over and above what they receive as constitutional officers representing the sovereignty of the state? Not one cent.

All written instruments of the Bank of North Dakota must be executed by the Industrial Commission, or under their direction, by some other person, as, for instance, the manager, under such powers as the Industrial Commission shall confer upon him. The manager of the Bank of North Dakota is the general agent of the Industrial Commission, and is specifically made so by the act creating the Industrial Commission.

The Industrial Commission has a seal. Every instrument and act of the Bank of North Dakota, of the state-owned Mill & Elevator Association, or the Home Building Association, which, if those acts were the acts of a private corporation, requiring a corporate seal, is sealed with the seal of the Industrial Commission. Their seal is just as authoritatively used in one of the state-owned industries as another. There is no distinction.

The Industrial Commission, as will be seen from § 1 of the act creating it (chapter 151 of the Session Laws of 1919), is established to conduct and manage (not on behalf of itself or on behalf of the Bank of North Dakota, nor the Mill & Elevator Association, nor the Home Building Association), but, on behalf of the state of North Dakota, certain utilities, industries, enterprises, and business projects, now or hereafter established by law. Can words be plainer? Can the language of that act, and all of the acts herein, be quite so distorted, misunderstood, and misconstrued as to arrive at any other conclusion than that the state owns and operates all of these industries in its sovereign capacity, and that none of such industries possess any of the qualities of a private corporation, or quasi private corporation? We say there can be but one answer, and that is, that the state owns and operates all these industries in its sovereign capacity, and every act done in connection with the operation of those industries is the act of the state of North Dakota, in its sovereign capacity. Hence, we see that the authority cited in the majority opinion has no application whatever.

We will discuss briefly two of the cases from the United States Supreme Court, cited in the majority opinion. All others there cited are the same in principle.

The case of Bank of United States v. Planters' Bank, 9 Wheat. 904, 6 L. ed. 244, cited as directly in point in this case, will, upon examination, be found to have no application whatever. In that case certain citizens of the state of Georgia and the state of Georgia organized a private corporation in just the same manner as if a number of citizens of the state of North Dakota, and the state of North Dakota, had organized one of the banks of Bismarck. The citizens of Georgia and the state were individual incorporators, in the Planters' Bank of Georgia. That bank was a corporation having all the officers that belong to any banking corporation. It had a president, a vice president, stockholders, and directors. If any profit were made in its operation, that profit went to the private incorporators, including the state. It had a corporate seal, as other private banking corporations has. It could sue or be sued, the same as any other private banking corporation.

Suits brought against the Planters' Bank of Georgia were, in that

case, held not suits brought against the state of Georgia. In short, that bank was just a plain banking corporation, organized for private gain and benefit to its incorporators.

Of course, in such case the mere fact that the state of Georgia was a private incorporator, just the same, and upon the same plane, as any other private incorporator, in that institution, would necessarily dispose of the contention that it could not be sued without its consent, by reason of its sovereignty. It became part of a private corporation. It, so to speak, became a part of that corporation as an individual and not as a state, and while it remained an incorporator thereof, its sovereignty did not attend it, because of the fact that the Planters' Bank of Georgia *was* a private corporation and incorporated as such.

None of those facts apply to the case at bar; but to proceed to demonstrate this more clearly would but lead to repetition. We think the point is clear. What has been said, with reference to the case of Bank of United States v. Planters' Bank, equally applies to the case of Briscoe v. Kentucky, 11 Pet. 257, 9 L. ed. 709. In the latter case, we have another private corporation, under the direction of a president and twelve directors chosen by the general legislative assembly. The bank was designated as a corporation, and was capable of suing and being sued. It is immaterial in such cases, that the capital of the bank was the property of the commonwealth. The principal point is, that the bank itself was a corporation, doing business on the same principles as any other private banking corporation. Whether the state of Kentucky owned one share of the stock, or all of the stock, is immaterial. It was a private banking corporation and incorporated as such; whether, under the regular incorporation act of the state of Kentucky, or by act of the legislature, is immaterial; and the United States Supreme Court held that the bank was a simple corporation, acting within the sphere of its corporate powers, and it needs no stretch of imagination to realize that when the state of Kentucky became an incorporator, or a part of that private corporation, it ceased to act in its sovereign capacity, and as that corporation had the right to sue and be sued, of course, the state of Kentucky could not claim any privilege, on account of its sovereignty, because it was a part of the private corporation.

That is not true of the case at bar. The state of North Dakota,

engaging in the banking business, has not become interested in any private corporation. It has created no private corporation. The Bank of North Dakota possesses no corporate powers of any kind or character, nor a single earmark incident to private banking corporations, as is above shown.

In this case, the state of North Dakota is engaged in the banking business in its sovereign capacity, under and by virtue of § 185 of the Constitution, as amended, and the laws enacted in pursuance thereof, creating the state industries, including the Bank of North Dakota.

The remainder of the authority cited in the majority opinion is exactly of the same nature as that above analyzed. It has no application whatever. It is not in point. It does not apply to this case. In most of the bank cases cited by the majority opinion, those banks, in addition to being private banking corporations, issue their own bank notes. The Bank of North Dakota does no such thing, nor has it attempted to. It uses the money and bank notes authorized by the Constitution of the United States; in short, our common medium of exchange. Their is no similarity or analogy between the cases cited in the majority opinion and the case at bar. No refined theory, or well-phrased language, can create any analogy or similarity. It is impossible.

We now desire to consider § 22 of chapter 147. The majority opinion, with reference to that section, uses the following language: "Furthermore, the act specifically grants the power to such bank (the Bank of North Dakota) to sue and be sued, the same as in any ordinary civil action, with all of the provisions of the Code of Civil Procedure applicable."

That section is set out in full in the majority opinion, and we will analyze it. First, it provides: "Civil actions may be brought against (whom?) *the state of North Dakota,* on account of causes of action claimed to have arisen out of transactions connected with the operation of the Bank of North Dakota, upon condition that the provisions of this section are complied with."

Now, against whom does that language say the action may be brought? Think of that language. Read it as it is written. Give it a fair and unbiased construction and interpretation, and let me have your answer. Does it say actions may be brought against the

Bank of North Dakota, on account of causes of action claimed to have arisen out of transactions connected with its operation? It certainly does not. It says that such actions may be brought against *the state of North Dakota.* Then what? It further says, "In such actions;" and we stop again to inquire: What actions are meant by the words "such actions?" And I again pause for an answer.

The words "in such actions" refer to what has been stated. It means in the actions brought against the state of North Dakota, on account of causes of actions claimed to have arisen out of such transactions, etc. It says, in plain language, in such actions the state shall be designated as *the state of North Dakota,* Doing Business as the Bank of North Dakota. The words "doing business as the Bank of North Dakota" are *descriptive* only of the relation of the sovereign powers being exercised by the state.

No distorted construction of language can read out of the language quoted, *any authority of the Bank of North Dakota to bring a suit, or any authority for it to be sued.* We challenge any member of this court who has signed the majority opinion, to place his finger on the language in the statute, that says anyone can be sued, *excepting the state of North Dakota. I not only challenge, but I defy.* I would be willing to leave the interpretation of this statute to a thousand of the most eminent lawyers and judges in the United States, and I dare say not a single one would say that the *Bank of North Dakota,* as such, by the terms of this statute, has any authority to sue or be sued.

The language is too plain. It needs no interpretation. Elaboration of explanation or analysis only confuses. Such language as is used in this statute is not capable of being elaborated upon. It is plain; it is simple; it is clear; it construes itself; it admits of no construction other than that the *state of North Dakota, in its sovereign capacity,* is alone the only entity against whom a suit may be brought, and who has the authority to bring a suit, with reference to any transaction connected with the Bank of North Dakota; for it is *this state* that is in the banking business. That is the language of the statutes above quoted. It may not be denied. It shall not be denied.

Section 22 further says: "And the service of process therein shall be made upon the manager of said bank." Who is the manager of the bank? What are his powers and relations to the bank? The act

creating the Industrial Commission, as above pointed out, makes him the general agent of the Industrial Commission, and we have above pointed out the qualities, characteristics, and powers of the Industrial Commission, which, in short, represents, and is, the sovereignty of the state, acting.

The plaintiff, in bringing this action, in the form and character of its summons and complaint, and its affidavit for garnishment, has construed the act just as we are contending that it must be construed. The suit here is brought against the state of North Dakota. In other words, the summons is in harmony with those provisions of § 22, which we have just analyzed. The complaint likewise makes the charges against the state of North Dakota, and in the affidavit of garnishment, after mentioning the various banks, who does the maker of the affidavit say is indebted to the plaintiff? It says, naming those banks, that each of them "is indebted to and has in its possession, money and credits belonging (to whom?) to the defendant, the State of North Dakota, Doing Business as the Bank of North Dakota."

Who is it that is doing business as the Bank of North Dakota? The only answer possible is, *the state of North Dakota.*

Section 22 provides: "Such actions may be brought in the same manner, and shall be subject to the same provisions of law, as other civil actions brought pursuant to the provisions of the Code of Civil Procedure."

The only effect of that provision is that the state consents to be sued in an ordinary action. It means that the summons and the complaint may be used in the same manner as in any other action. That is, that the action may be brought against the state of North Dakota, by the service of a summons, just the same as against an individual in any other civil action.

The word "action" is defined in § 7075, Comp. Laws 1913, as follows: "Action includes counterclaim and set-off."

In § 7355, Comp. Laws 1913, it is stated: "The distinction between actions at law and suits in equity, and the forms of all such actions and suits heretofore existing are abolished; and there shall be in this state hereafter but one form of action for the enforcement or protection of private rights and the redress of private wrongs, which shall be denominated a civil action. *In such action the party com-*

*plaining shall be known as the plaintiff and the adverse party as the defendant."*

Section 7420 provides that an action shall be commenced by the service of a summons. Section 7422 prescribes the form of that summons. An action cannot be commenced by a garnishee summons.

By chapter 9 of the Code of Civil Procedure a garnishment is not classified as an action, but *is* classified as a *provisional remedy* in civil actions.

Section 7487 classifies the provisional remedies in civil actions as:

(1) Arrest and bail.

(2) Claim and delivery of personal property.

(3) Injunction.

(4) Attachment.

(5) Garnishment.

(6) Receivers.

(7) Deposit in court.

All of these remedies are part of the Code of Civil Procedure. Under the effect claimed to be given by the majority opinion to that part of § 22, which provides that actions may be brought in the same manner, and shall be subject to the same provisions of law as other civil actions brought pursuant to the provisions of the Code of Civil Procedure, all, of such provisional remedies would be as available as garnishment. Where is the difference and why the distinction?

If, under the language of the act, garnishment will lie because that provisional remedy is found in the Code of Civil Procedure, on the same parity of reasoning every other provisional remedy would apply.

As we understand and construe § 22, it refers to a general action, and not to any provisional remedy. By that section the state has simply consented to be sued, and thus afford an opporunity to determine any controversy on its merits that may arise out of any of its transactions, in its conduct of its banking interests.

If, in such action, a judgment should be procured against the state, § 8177 would apply. So that no execution could issue against the state, and no better remedy is needed than is contained in § 8177; for when a judgment is obtained in any action against the state, the clerk of court simply makes a certified copy of such judgment, and furnishes it to the state auditor, who, in the due course of the conduct

of his duties, will draw his warrant upon the state treasurer, for such amount, and deliver the same to the person entitled thereto.

That may be done in this case, but garnishment will not lie against sovereignty, any more than injunction or receivership would lie. Certainly no receivership could be applied for or allowed, as that would be asking for a receiver for the state of North Dakota; for, as we have seen, it is the state of North Dakota, and the state of North Dakota only, who, under the constitutional provision and laws above mentioned, is actually engaged in the banking business, under the name of the Bank of North Dakota.

We feel certain that our position in this case is unassailable, and in closing we wish only to add:

If these state-owned-and-operated industries are to be annihilated, let it be done by the same agency that created them,—by the people of this state, in the exercise of their sovereign power. Let them do it, if they desire, by the exercise of their elective franchise. In the exercise of this sovereign right, they have authority and privilege to amend the Constitution, or laws, and to enact or repeal laws by and through the legislature. If the people of this state do not wish these state-owned-and-operated industries, they may dispense with them by an exercise of the elective franchise, the majority concurring.

But let not this court, by judicial fiat, strike down these state-owned-and-operated industries, and thus deny the people the rights and privileges which inured to them by the amendment of § 185 of our Constitution and the laws enacted in pursuance thereof, and which authorized and created these state-owned-and-operated industries.

I beg of my associates (each of for whom I have the utmost respect) to halt, and reflect, before they, by their decree, strike down sovereign rights of a great and good people, which rights emanate from § 185 of the Constitution, as amended, and the laws above mentioned.

The rights which the people of our beloved state have thus acquired, under that section of the Constitution and those laws, have come to them only after many decades of incessant struggle, and perseverance, and against the fiercest and most unrelenting opposition; opposition in the form of great and concentrated wealth; opposition of corporate greed; opposition of great and vested interests, and opposition of part of the public press, which part in general champions the

right of those enjoying and exercising special privileges and controlling great wealth, to gain unjust advantage over the common people, and the laborer, the farmer, who are the producers of real wealth, and which part of the public press listens joyously to the siren song of its advertisers, and too often disregards its own sacred duty, yes, its constitutional duty, to defend the rights, privileges, and liberties of the people, for we confidently believe that our justly venerated constitutional fathers would not have so securely thrown the mandate of Federal constitutional protection about the public press, if it had been thought that part of that public press should so far deviate from its true course of conduct and duty as to become the champion and defender of the economically great and powerfully represented in perfect organization, as against the economically weak, the unorganized common and wealth-producing citizen whose greatest ambition in life is to labor and serve faithfully and well his God and his country.

A volume might be written, portraying the opposition encountered in securing the rights provided for in § 185, as amended, and the laws above referred to. But it is not necessary. That opposition, its character, its tenacity, its nature, is a matter of common knowledge.

In conclusion, we assert that the majority opinion, in the conclusions arrived at therein, is clearly nothing less than judicial legislation. The conclusion which it draws are so patently erroneous when compared with the laws above mentioned, that this becomes obvious on the merest inspection.

The majority opinion in effect concedes that all the industries above instituted and initiated by the state of North Dakota are so initiated for a public purpose. It does this because it recognizes the correctness of the decision in the case of Green v. Frazier, 44 N. D. 395, 176 N. W. 11, as handed down by the court, and as affirmed by the Supreme Court of the United States.

The majority opinion contains this language:

"It may not be *denied* that the *state of North Dakota*, pursuant to constitutional and statutory enactment, has engaged in the business or enterprise of banking. *No question is raised in that regard.* In the case of Green v. Frazier, supra, this court determined that the engagement of the state in such enterprise was for a public purpose to accomplish the objects sought thereby. Upon writ of error to the

Supreme Court of the United States, that court declared that the united judgment of the people, the legislature and the court of this state that the purposes involved were public, would be accepted unless clearly unfounded, and such court declined to set aside the action of this state in that regard."

The majority opinion therefore admits that all of these industries, including the Bank of North Dakota, were created and exist for a public purpose. If so, they are *conducted by the state of North Dakota* in its sovereign capacity. This being true, those industries may be supported by taxation of private property. Under the admissions in the majority opinion above set forth, the contention therein that these industries are quasi private corporations falls flat. The fact that none of these industries can sue or be sued, as we have very clearly above pointed out, also operates to destroy entirely the contentions of the majority opinion. These industries, being for a public purpose and use, as is conceded by the majority opinion, cannot therefore be, by any stretch of imagination, denominated as private corporations, or quasi corporations, of the same general nature as any other private business corporation.

Further elaboration cannot show more clearly that the majority opinion is clearly, conclusively, and absolutely erroneous. Justice to the public requires that the order appealed from should be reversed, and the case remanded, and the District Court ordered to dismiss the garnishment proceedings.

On Petition for Rehearing, Filed April 4, 1921.

BIRDZELL, J. The petition for rehearing states six distinct grounds in support of the motion. The first is that the decision is contrary to law. In support of this contention the following assertions are made: (a) That the decision is not in conformity with the laws and Constitution of the state of North Dakota; (b) that it is judicial legislation in that it amends an act of the legislature which had been referred to the people and approved by them; (c) that it annuls the constitutional provision which authorizes the state in its sovereign capacity to engage in any industry, enterprise, or business other than the manufacture and sale of intoxicating liquors.

The second ground of the motion is that the comparison made in the principal opinion between the manner in which the Bank of North Dakota is organized and that disclosed in the legislation of certain southern states does not warrant treating the United States Supreme Court decisions, based upon the latter, as authorities in support of this decision.

The third ground is that the court erroneously assumes that a department of the state may be sued or be subject to suit depending upon the powers conferred and liabilities imposed.

Fourth, that the court failed to consider § 5188, Comp. Laws 1913, which exempts banks from attachment and execution; also § 7583, which relieves from garnishment property which is exempt from execution.

The fifth and sixth grounds do not go to the merits of the decision and need not be stated.

On account of its extraordinary importance, this case merits most careful consideration. Every point presented as having any bearing on the soundness of the conclusions heretofore reached in the decision of the case has received the undivided attention of every member of the court. A careful weighing of all the contentions advanced in the light of express constitutional and statutory provisions has served but to confirm the majority of the court in the views previously expressed. While added reasons in support of these conclusions may be superfluous, it is nevertheless deemed proper to state more fully than has been done before some of the principal considerations leading inevitably to the original result.

It is said: "The court holds that the Bank of North Dakota is not the state of North Dakota, but something else which it has not been able to clearly define, and this, for the reason that it is not something else, but that it is the state."

And then it is asserted: "It has been made the state by the laws and the Constitution of the state."

Section 185 of the Constitution, as amended by article 33, is referred to as authorizing the state to engage in any industry, enterprise, or business not prohibited by article 20, and since the same section and article prohibits the state from loaning or giving its credit or making donations in aid of individuals, associations, and corpora-

tions, it is argued that the bank cannot be considered in any sense an entity apart from the state. To treat it as a separate entity, it is said, is to involve the state in a violation of the latter clause. We think this argument clearly proves too much. It would prove that the state could make no donation to any public institution where it invested the same with a corporate or quasi corporate character. Yet it is constantly lending its support to fair associations, educational institutions, etc., upon which it has conferred corporate capacity. On the contrary, we are clearly of the opinion that the violation of the prohibition against lending public credit in aid of corporations, etc., is openly countenanced by considering the state and the bank as the same entity, as is done by the petitioners.

Let us first examine the petitioners' argument in the light of the act creating the bank. Section 2 of the act (Sess. Laws 1919, chap. 147) provides:

"The business of the bank, in addition to other matters herein specified, may include anything that any bank may lawfully do, except as herein restricted; but this provision shall not be held in any way to limit or qualify either the powers of the Industrial Commission herein created, or the powers of said bank, herein defined."

Section 15 provides:

"The Bank of North Daktoa may transfer funds to other departments, institutions, utilities, industries, enterprises or business projects of the state, which shall be returned with interest to the bank. It *may make loans* to counties, cities or political subdivisions of the state, or *to state or national banks* on such terms and under such rules and regulations as the Industrial Commission may determine; but it shall not make loans or give its credit to any individual, association or private corporation, except that it *may make loans to any individual, association or private corporation secured by* duly executed *first mortgages* in amounts not to exceed one-half the security *or* secured by *warehouse receipts* issued by the Industrial Commission or by any licensed warehouse in the state in amounts not to exceed 90 per cent of the value of the commodities evidenced thereby."

The first quotation (from § 2) clearly gives the Bank of North Dakota power to borrow money unless there are restrictive words elsewhere in the act. For it appears that it is given every power in this

respect that any other bank has.  A reading of the remainder of the act fails to disclose any restrictions upon the power to borrow money, and it is a well-known fact that the bank has in fact, within the past year, exercised this power by borrowing $1,000,000, for which loan it pledged as collateral bonds of the state in a larger amount held among its assets.  This loan has recently been repaid.  There will be occasion to refer to this matter in another connection.  The language quoted from § 15 expressly confers upon the bank power to loan money not only to political subdivisions, but to *state and national banks.*  That its power to loan has been exercised clearly appears from its last statement (March 15, 1921), where the following items appear as resources:

Loans to banks ............................. $2,312,865.05
Loans on warehouse receipts ....................   70,656.90
Loans to public institutions and departments ....... 1,195,000.00
Loans on real estate .......................... 2,881,089.92

So, again, referring to the constitutional provision upon which counsel so urgently stress the argument that the Bank of North Dakota is the state of North Dakota, we find that this section relied upon prohibits *the state* from doing the very thing that the legislature has expressly authorized *the bank* to do, and which it has done, namely, loan its credit to individuals, associations, or corporations.  If the Bank of North Dakota is the state of North Dakota, it could not, therefore, possess any such authority as the legislature has expressly conferred in § 15.  It surely would not be contended that the state, when acting as the Bank of North Dakota, can do the things which the Constitution says the state cannot do at all.  The state, when functioning as a bank, is still subject to the express limitations of the Constitution.  The creation of this agency of the sovereign power cannot result in a superstate,—a government functioning without constitutional restraint.  It (the bank) may hazard the capital it has been authorized to use in whatever way may be deemed expedient, and within the law, in order to make the banking business a success, but it cannot involve the state by attempting to pledge its credit in transactions the state is expressly prohibited from entering into.

When we extend the examination of statutory and constitutional provisions with a view to determining the character of the agency of the bank, additional provisions are found which demonstrate that the bank, though owned by the state, is not in fact the state. Turning now to chapter 148 of the Session Laws of 1919, which provides for the issuing of the bank series of bonds; after prescribing the formalities for preparation and issuance, the law provides in § 4:

"Nothing in this act, however, shall be construed to prevent the purchase of any of said bonds with any funds in the Bank of North Dakota."

Similar provisions are found in the acts authorizing the issuance of $5,000,000 of the bonds of the mill and elevator series (chap. 153, § 7), in the act providing for the issuance of $10,000,000 of bonds of the real estate series (chap. 154, § 6), and also in the act authorizing the home building series (Laws Special Session 1919, chap. 24, § 6). Section 7 of the Bank Act provides for the deposit of all the state funds in the Bank of North Dakota. Note, however, the exception of the sinking fund of real estate series (Laws 1919, chap. 154, § 7). This, of course, would include the proceeds of the sale of bonds. These proceeds are, in the case of the bank bonds "designated as the capital of the Bank of North Dakota" (§ 4, chap. 148), and, in the case of the mill and elevator series, the proceeds are required to be "placed by the Industrial Commission in the funds of the association" (§ 7, chap. 153). Again, referring to § 15 of the Bank Act, it provides that the bank may transfer funds to other departments, institutions, utilities, industries, enterprises, or business projects of the state, which shall be returned with interest to the bank. Now, referring to § 175 of the Constitution, which reads: "No tax shall be levied except in pursuance of law, and every law imposing a tax shall state distinctly the object of the same, to which only it shall be applied," it is pertinent to inquire what relation the bank or the state sustains with reference to the various deposits of public funds required to be deposited therein?

If the bank is but the state holding these funds as a mere custodian, as a treasurer would hold them, they would not lose their character as public funds; and if the bank, in all its business relations, is but the state, whenever it would follow the express direction contained in the

law to transfer, invest, or loan its funds, it would do so in the direct pursuit of a governmental object. Manifestly, if this governmental object should differ from that for which the funds were originally raised by taxation, the mandate of § 175 of the Constitution, requiring tax moneys to be applied to the purpose for which they were raised, would clearly be violated. Can it be seriously contended that moneys raised by taxation for the support of the public schools in a remote section of the state are authorized to be used for the purpose of building a home for a bank cashier in the capital city of the state? This is the logical result of the petitioner's argument. The steps are these: The bank is the state, because the Constitution authorizes the state to engage in the banking business. The things that are done by the bank are therefore done by the state in pursuit of whatever governmental object the bank is authorized to attain. To attain these objects, public moneys are required to be deposited in the bank, there to be used through loan or transfer to finance any of the authorized operations. The flaw in the argument, as we see it, is this: It not only ignores the effect of express constitutional limitations upon the powers of the state government itself, but it ignores as well the legal effect of what the legislature actually did when it authorized the use of the credit of the state for the purpose of supplying *capital funds* to be used to form a separate organization through which it might seek to accomplish certain governmental ends. In attaining these ends, if the state should act directly, it would be hampered by reason of express constitutional limitations. But it can hazard whatever money, lawfully obtained, it may be authorized to use in conducting the particular business. To make the business a success, it may be necessary to vest in its agencies powers that could not be conferred on public officers whose acts as such would bind the state unqualifiedly. These agencies hazard only the appropriated capital, not the public credit. Doubtless it was partly on account of these limitations that it was thought best to appropriate a certain capital for use in the banking business, and to create a bank organization which, using this capital fund as its basic security, could so handle the funds deposited with it as to realize the governmental objects sought, without trenching upon the constitutional limitations applicable to the state itself. It

47 N. D.—39.

cannot be reasonably contended that the constitutional authority to engage in certain businesses nullifies by implication express limitations on the powers of the state government, especially where these limitations are embodied in amendments adopted concurrently with those giving the authority.

We have no doubt that under the Bank Act the bank sustains the relation of debtor with respect to all of the deposits, both public and private, that are placed in it. It is simply the authorized depositary of the public funds, and holds them in the same capacity that private depositary banks customarily held them before the Bank of North Dakota was created. There is a vast difference between this relationship and an official custodianship, in which the official is using the funds in furtherance of the particular purpose for which they were raised by taxation.

Pursuing the subject of legislative intent further in the light of still another constitutional provision: article 31 of the Amendments to the Constitution so amends § 182 of the original Constitution as to authorize the issuance of unsecured bonds to the extent of $2,000,000, certain real-estate bonds, and bonds secured by real or personal property or state-owned utilities up to $10,000,000. It then provides as follows: "No future indebtedness shall be incurred by the state unless evidenced by a bond issue, which shall be authorized by law for certain purposes."

We have previously referred to the fact that the Bank of North Dakota had borrowed $1,000,000, thereby, of course, becoming indebted in that sum. It is doubtless authorized by the Bank Act to borrow money. If it could borrow $1,000,000, pledging bonds held by it as collateral, it could borrow such greater sums as its business seemed to warrant, without collateral or with whatever collateral there demanded by the lender, and for every dollar so borrowed, if the contentions of the petitioner are correct, the state would be liable. Not only would the state be liable, but the creditor could obtain a judgment only against it which he could satisfy only by resort to the state treasury, being denied access to the resources of the bank. Thus, the limitation contained in article 31 of the Amendments, which was adopted at the same election as article 32, authorizing the state to engage in business, would be effectually nullified.

Some attempt is made to show that the limitation against future indebtedness does not apply where, as a result of the transaction, there is a corresponding amount of funds available for meeting liabilities. Conceding that this argument is to some extent applicable where a municipal corporation desires to borrow money for an authorized purpose, and where it already has certain funds in the treasury applicable to outstanding obligations, so that the debt limit may be properly calculated by subtracting from outstanding debts the available funds in the treasury (Anderson v. International School Dist. 32 N. D. 413, L.R.A.1917E, 428, 156 N. W. 54, Ann. Cas. 1918A, 506), it is clear that it has no application to such a situation as that presented here. If the argument is valid as applied to the borrowing power of the state in its present circumstances, considering the bank as the state, it is obvious that the language, "no future indebtedness shall be incurred by the state unless evidenced by a bond issue, which shall be authorized by law for certain purposes," means nothing. There would be no limit, as every exercise of the power to borrow would simply result in increasing available funds, and the transaction could be repeated ad infinitum. A concrete example may serve to illustrate the fallacy of the argument. If the funds on deposit, public or otherwise, in the Bank of North Dakota, seemed to the management to justify it, the bank might purchase $5,000,000 of the bonds of the mill and elevator series. It would still owe to the depositors the amount of deposits thus invested, but the state would owe the bank a like sum. Then the bank might borrow $4,000,000 elsewhere, pledging these bonds as collateral, in which event the state, if petitioner's argument is sound, becomes indebted to the extent of $9,000,000, only $5,000,000 of which is represented by bonds. Then this $4,000,000 could be used to buy more bonds to serve as collateral for another loan, and so on. What then has happened to this provision of the Constitution?

"No future indebtedness shall be incurred by the state unless evidenced by a bond issue, which shall be authorized by law for certain purposes."

No bonds were issued for the $4,000,000 of obligations, and the purpose for which the loan is made is not clearly defined by law. It may be any purpose the managers of the bank should deem proper.

The proceeds could be transferred to any department or industry, or reloaned under the Bank Act, or used to purchase other bonds of the state.

In this case the court is, of course, concerned merely with the question of ascertaining the legislative intention in adopting the Bank Act. One of the primary canons of interpretation, so well known as to have become trite, is that as between two possible constructions of a legislative act, one of which will render it constitutional and the other unconstitutional, that construction is to be adopted which renders it consistent with the Constitution. We are confronted by the alternative of so construing the act in question as to make the bank and the state identical for all purposes, on the one hand, which would clearly render it unconstitutional in toto for the reasons stated; or of considering the act as one in which the legislature, in carrying out the authority vested in it by the Constitution, has hazarded a certain amount of capital furnished by the state in the transaction of the busi-ness of banking, subject to such regulations as appear in the act. In the handling of this capital fund in carrying on the banking business, it has clearly been thought necessary to vest in the managers of the enterprise powers which could not be given to officers authorized to bind the state by their acts. We are clearly of the opinion that under § 185 of the Constitution as amended, the state may engage in the business of banking and hazard a certain amount of capital therein. In conducting that business it may render that capital subject to the fulfilment of contracts which the bank may be authorized to enter into, and upon which the state itself is precluded from assuming an unlimited liability. A constitutional authorization to engage in the banking business may well carry with it by implication the power to do the things necessary to make a business successful, but where all these things can be done without nullifying other express constitutional restraints imposed for the protection of the people as a whole, it is the sworn duty of this court to uphold the express limitations.

Much stress has been laid upon the wording of § 22 of the Bank Act. It reads:

"Civil actions may be brought against the state of North Dakota on account of causes of action claimed to have arisen out of transactions connected with the operation of the Bank of North Dakota,

upon condition that the provisions of this section are complied with. In such actions the state shall be designated as "the State of North Dakota, Doing Business as the Bank of North Dakota," and the service of process therein shall be made upon the manager of said bank."

In the light of the statutory and constitutional provisions hereinbefore considered, we do not see that particular importance attaches to this language. In so far as legal analogy may be resorted to to determine its real meaning, it clearly points to the meaning that only such liability is to be determined in any such action against the state as has arisen in connection with the bank. The closest analogy occurring to us is that of a suit against a partnership. In such an action the partners are individually named, and they are described as doing business in their firm name. But in an action so brought the partners are apprised that the matter is to be litigated as a partnership transaction, and not an individual one. At common law the partners could not even interpose a counterclaim based upon a debt owing by the plaintiff to one of the members of the firm individually. The law affords still another and closer analogy, possibly, in the limited partnership where the firm is similarly described, but yet where one or more of the partners has hazarded only a limited amount of capital in the venture. We are of the opinion that the qualifying portion of the expression designating the defendant as doing business as the Bank of North Dakota is the legally appropriate description of the capacity in which the defendant is sued, and that it implies the existence of all inherent limitations which existed with reference to the imposition of such a liability. These limitations, for the reasons hereinbefore stated, are such that the judgment obtained is only binding upon the state to the extent of the capital it has put into the bank. For the purpose of determining this liability, the bank is, in legal effect, an entity, for it is legally incapable of binding the state beyond its interest in its capital funds.

Turning now to the argument that the court has failed to give proper consideration to § 5188, Comp. Laws 1913, which exempts banking associations from the legal processes of attachment and execution: It is said that garnishment is but a form of attachment, and we are referred to the case of Safford v. Plattsburgh Nat. Bank, 61 Vt. 373, 17 Atl. 748, where it was held that the trusteeing of a debt

due to a national bank is in fact an attachment of the property of the bank within the provision of the National Banking Act, Rev. Stat. § 5242. Comp. Stat. § 9834, 6 Fed. Stat. Anno. 2d ed. p. 903. That provision reads: ". . . and no attachment, injunction, or execution, shall be issued against such association or its property before final judgment in any suit, action or proceeding, in any state, county, or municipal court."

It seems that the portion of the section above quoted came into the act of June 3, 1864, by way of amendment adopted in 1873. Its history is set forth in the New York case of Van Reed v. People's Nat. Bank, 173 N. Y. 314, 105 Am. St. Rep. 666, 66 N. E. 16.

The construction of the above act was for a long time involved in some difficulty, and there is a lack of harmony in the earlier cases. See 2 Morse, Banks & Bkg, § 257. It had been held, for instance, in New York (Southwick v. First Nat. Bank, 7 Hun, 96), that the act did not prohibit attachment against the property of a national bank located in another state, when attachment afforded the only means for creditors of the jurisdiction to pursue their claims within it. This case, as well as others of similar import, were later overruled in Van Reed v. People's Nat. Bank, supra. In the latter case the New York court of appeals was influenced by the decision of the United States Supreme Court in Pacific Nat. Bank v. Mixter, 124 U. S. 721, 31 L. ed. 567, 8 Sup. Ct. Rep. 718. The Van Reed Case went to the United States Supreme Court on writ of error, and that court (Van Reed v. People's Nat. Bank, 198 U. S. 554, 49 L. ed. 1161, 25 Sup. Ct. Rep. 775, 3 Ann. Cas. 1154) reaffirmed its holding in the Mixter Case, so that by an authoritative interpretation of the Federal statute by the United States Supreme Court it is now thoroughly established that there may be no attachment, execution, or injunction against a national bank before judgment, whether there be any other means of acquiring jurisdiction or not, and whether the bank be solvent or insolvent or approaching insolvency.

In the light of this construction it is indeed interesting to note the decisions of the United States Supreme Court in garnishment proceedings. In construing the same statute that court has clearly recognized the distinction between garnishment and attachment, injunction,

or execution. In two cases the court was called upon to determine whether or not a national bank could properly be made a garnishee where no judgment had been previously obtained against it. The cases are Earle v. Pennsylvania, 178 U. S. 449, 44 L. ed. 1146, 20 Sup. Ct. Rep. 915; and Earle v. Conway, 178 U. S. 456, 44 L. ed. 1149, 20 Sup. Ct. Rep. 918. It was held in the first case that an attachment against a national bank *as garnishee* is not an attachment against the bank or its property, nor a suit against it within the meaning of § 5242. In that case one Mary Rogers had obtained a judgment in the common pleas court of Philadelphia against one James Long. A writ of attachment issued upon the judgment, and an alias writ issued against the Chestnut Street National Bank *as garnishee*. The bank answered interrogatories as garnishee, and the plaintiff obtained a rule for judgment against it as garnishee on its answers. A few days later the bank suspended payment. The receiver attempted to vacate the attachment as being null and void under § 5242. The court held it valid, saying:

"Whatever may be the scope of § 5242, an attachment sued out against the bank *as garnishee* is not an attachment against the bank or its property, nor a suit against it, within the meaning of that section. It is an attachment to reach the property or interests held by the bank for others. After the Chestnut Street National Bank had been served as garnishee with the attachment sued out in the Long suit, but before it went into the hands of a receiver, it admitted in its answers to special interrogations in the suit against Long that it was indebted to Long on a clearing-house due bill, and also that it held as collateral security for his debt to it certain shares of the stock of the Eighth National Bank of Philadelphia. By the service of the attachment upon the bank, *the plaintiff in the attachment acquired a right to have the money and property belonging to Long in the hands of the bank applied in satisfaction of its judgment against him,* subject, of course, to the bank's lien for any debt due to it at that time from him. The bank, therefore, became bound to account to the plaintiff in the attachment for whatever property or money it held for the benefit or to the use of Long at the time the attachment was served upon it. And the right thus acquired by the service of the attachment was not lost by the suspension of the bank and the appointment of the receiver.

The assets of the bank passed to the receiver burdened, as to the interest that Long had in them, with a lien in favor of the plaintiff in the attachment, which could not be disregarded nor displaced by the Comptroller of the Currency." (Italics are ours.)

In the Conway Case, which involves the same bank, Conway had obtained a judgment against one Schall. A writ of attachment was issued and served on May 24 and 25, 1898, upon the Chestnut Street Bank and upon Earle, receiver, as garnishee, he having been appointed the previous January. The court held, for the reasons stated in the other case, that the attachment could not create any lien upon physical assets of the bank in the hands of the receiver, nor disturb his custody of these assets, but that it became the duty of the Comptroller of the Currency to hold any funds coming into his hands as proceeds of the sale of the bank's assets, subject to any interest which the plaintiff may have legally acquired as against his debtor under the attachment issued on the judgment in his favor.

It will be seen then that, under the Federal statute upon which the Vermont case cited is based, the decisions of the United States Supreme Court distinctly recognize the difference between an attachment in a suit against a national bank, where it is sought to obtain a judgment against the bank, holding the attached property subject thereto, and a garnishment, where it is sought only to subject a claim the bank owes to the defendant in the main action to the payment of his debt,—a proceeding, in other words, which effects an assignment by operation of law of a claim against a bank. If the object of the proceeding is the latter, it is not regarded as an attachment against the bank such as prohibited by the Federal statute. These decisions supporting garnishment under the Federal statute were referred to in the later case of Van Reed v. People's Nat. Bank, 198 U. S. 554, 49 L. ed. 1161, 25 Sup. Ct. Rep. 775, 3 Ann. Cas. 1154, and it was said that they in no way qualified the decision in the Mixter Case, 124 U. S. 721, 31 L. ed. 567, 8 Sup. Ct. Rep. 718. Thus, the construction of the Federal statute, in so far as it affords an analogy to the instant case, is distinctly in support of the garnishment.

To hold that a bank may not be made a garnishee is, in effect, to read into the statute, § 5188, Comp. Laws 1913, a prohibition that is not there. The legislature, it must be assumed, was just as familiar

with garnishment as it was with attachment and execution, and with the differences in the operation of those remedies. It was just as cognizant of all of these terms as this court is. When it prohibited attachment and execution against banking associations, therefore, omitting garnishment, it must be assumed that the omission was intended. We think it clear that § 7583, which relieves from garnishment property that is by law exempt from execution, has no application to the garnishment proceedings in question. For it is the clear purpose of that statute to give effect to the exemption laws. Exemption laws exist to secure to debtors the right to enjoy "the comforts and necessaries of life." N. D. Const. § 208.

Entertaining no doubt as to the correctness of the conclusions stated in our former opinion, the petition for rehearing should be denied. It is so ordered.

ROBINSON, Ch. J., and CHRISTIANSON, J., concur.

BRONSON, J. The defendant has filed a petition for rehearing, wherein it is contended again that the Bank of North Dakota is the state, and as such is not subject to garnishment, and, further, that this court judicially legislated in holding to the contrary. The petition presents no legal issues that have not been fully considered by the court. It presents no legal determinative issues other than those considered and determined by the majority opinion. It reasserts many of the contentions made by Justice Grace in his dissenting opinion. Both the petition and the dissenting opinion, therefore, merit consideration not only by reason of the importance of the case, but also because of an interpretation attempted to be placed upon the majority opinion and the presentation of issues thereby, that lead far afield from the determinative issues in this case. To state that a court is judicially legislating concerning, or judicially destroying, a state enterprise or industry, is perhaps easy in bald assertion, but difficult in demonstration. Upon this court is imposed the sworn duty to uphold the Constitution of this state, as well as its laws; not one constitutional provision, not one law, but all of them. The same sovereign power, the people, that have sanctioned the Constitution, and the laws thereunder, imposed this duty upon the court. Amidst the turmoil

and strife of partisan controversy in this state, the noise and rumble of which are heard within and without the state, the judiciary, if it shall perform its sworn duty fearlessly and independently, must determine legal controversies upon the law and legal issues. The law is the Constitution, paramount, the statute, subordinate: All, the law when harmonious and consistent. The latter must be upheld when, upon interpretation, it may be rendered harmonious and consistent with the Constitution. Otherwise, it must yield to the paramount law. This law, the whole law as prescribed, must be upheld, as it is written, by the judiciary, pursuant to its imposed duty, disregarding and unmindful of the partisan clamor of approval or disapproval resulting. Mortal men err; judges err; mortal men differ; so do judges; but upon questions of law, upon legal issues, must judges, upon their conscience and sworn duties, differ. Thus, discrediting neither the sincerity of purpose of the attorney general in his petition, nor the vigorous dissenting opinion of our Honorable Associate Justice, the pertinent legal questions are to be approached and considered.

All of the assertions made in the extended dissenting opinion, and in the petition, to the effect that the state of North Dakota, in its sovereign capacity, is engaged in the banking business, and that the Bank of North Dakota is not a private bank, appear to be the violent threshing of a pseudo issue, and far distant from the legal issues involved. This court, in the majority opinion, has stated that it may not be denied that the state has engaged in the business or enterprise of banking; that the question was not whether the sovereign power of the state is engaged in the banking business, but rather concerns the question of the status of a sovereign agency when exercised in an engagement of a business or enterprise. Attention is thus called to the opinion of the court, so that the false bottom created for the contentions and arguments made that the Bank of North Dakota is held to be a private corporation may be seen. What application, therefore, has § 185 of the Constitution relating to the loaning of the state's credit to a private corporation?

So, reversion occurs to the real legal issues, (1) Is the Bank of North Dakota, the state; and (2) Is it subject to garnishment?

First. It is asserted that the status of the state of North Dakota is

the only question concerned. What is that status? Is it not a status subject to all constitutional and statutory provisions applicable to the state as such? But it is requested that a finger be placed on the statute, stating that anyone but the state of North Dakota may be sued with reference to transactions with the Bank of North Dakota. The statute says that actions may be maintained in the name of the State of North Dakota, Doing Business as the Bank of North Dakota. Why, the need of any pan handle to the name of the state, if the bank is the state? Why is it that the statute provides that all business of the bank may be conducted under the name "The Bank of North Dakota? Laws 1919, § 21, chap. 147. Is it the status of the state of North Dakota or the status of the State of North Dakota, Doing Business as the Bank of North Dakota, that is being considered? Is it not possible for the state to create an agency of the sovereign power and give to such the status of an agency of the sovereign power? When the state engaged in the bonding business, and created the state bonding fund under the management, control, and supervision of the Commissioner of Insurance (Laws 1915, chap. 62), were the fund, and the Commissioner while acting in the duties thereof, the state, or an agency thereof with a separate status. The Commissioners may be sued; judgments may be rendered against the fund; the moneys therein are not state funds. Laws 1915, chap. 62. State ex rel. Linde v. Taylor, 33 N. D. 109, L.R.A.1918B, 156, 156 N. W. 561, Ann. Cas. 1918A, 583. So when the state established the hail insurance fund (Laws 1911, chap. 23; Laws 1919, chap. 160; see State ex rel. Olson v. Jorgenson, 29 N. D. 173, 150 N. W. 565) state fire insurance (Laws 1919, chap. 159) and teachers' pension fund (Laws 1915, chap. 251), and the workmen's compensation bureau (Laws 1919, chap. 258), were not agencies of the sovereign power created?

Was the United States Shipping Board Emergency Fleet Corporation created by the United States, with a capital stock of $50,000,-000, all owned by the United States, and stated by congressional act to be considered a government establishment, the United States, or an agency thereof? In United States v. Strang, 254 U. S. 491, 65 L. ed. 368, 41 Sup. Ct. Rep. 165, it is held, citing the United States decisions quoted in the majority opinion herein, that it must be regarded as an entity separate from the United States.

Was not an agency created when the legislative act established the Bank of North Dakota? Does this agency function the same as the state? Why does this agency do a business under a distinct name and all of its dealings under the head Bank of North Dakota? Are its funds public funds? Are its obligations and indebtedness created direct indebtedness of the state, its parent? Is a deposit made by Jones, a private person, made a public fund, subject to disbursement by the state in payment of governmental expenses of the state? When a million dollars was borrowed in Chicago and a note given therefor, was such note a direct indebtedness of the state or of the bank? Were the millions of dollars on deposit in this bank in July, 1919, deposited by municipal subdivisions, private banks, and private individuals, state public funds, and funds for which the state was directly obligated as such?

The banking act provides that this bank may do the business that any bank may lawfully do, except as specifically restricted in the act. § 2. It provides that this bank may act as a clearing house, § 11. It particularly specifies for it the functions of a bank; it provides that funds may be deposited to the credit of the bank, or that the bank may deposit funds in any bank or banking association. §§ 9, 14. It further specifically provides that this bank may make loans to an individual, association, or private corporation secured by duly recorded first mortgages on real estate. § 15. It further provides that such mortgages shall run to the manager of the Bank of North Dakota. § 18. It further provides that such mortgage, together with the note, may be assigned to the state treasurer of the State of North Dakota, as security for bonds issued by the state. § 20. It further provides that the business of the bank may be conducted under the name of the Bank of North Dakota, § 21. Do these provisions of the act, and functions assigned to this bank, create directly the engagement of the state as such, or does it rather show the creation of an agency, a sovereign agency, for the performance of the functions assigned?

The dissenting justice refers to § 185 of the Constitution, which provides that the state may not loan or give its credit in aid of any individual, association, or corporation. The Bank Act, however (§ 15) states that the Bank of North Dakota may make loans to an in-

dividual, association, or private corporation. Is this section of the act unconstitutional because the bank is the state, or rather is it to be said that this agency, as an agency, possesses the function so to make loans. Article 31, Amend. Const., provides that no future indebtedness shall be incurred by the state unless evidenced by a bond issue which shall be authorized by law for certain purposes to be clearly defined, and no debt in excess of the limit named therein (relating to the issuance of the bonds) shall be incurred, except for the purpose of repelling invasion, suppressing insurrection, defending the state in time of war, or to provide for the public defense in cases of threatened hostilities. This constitutional amendment was adopted at the same time that the constitutional amendment which provides that the state may engage in enterprise and industry. Do these constitutional provisions place any limitation upon indebtedness for the state as such?

In State ex rel. Langer v. Hall, 44 N. D. 536, 173 N. W. 765, Judge Grace, in the opinion of the court, stated that the main question to be determined in the case was, "What is the debt limit under § 182 of the Constitution as amended? The state contends that it is $2,000,000, in addition to the existing bonded indebtedness. The defendant contends that it is $2,000,000 less $412,000 of existing bonds of indebtedness. After a careful and painstaking examination of the whole subject-matter of the controversy, we are firmly convinced that the contention of the state must be sustained." It is apparent that his holding in that case was that there was a constitutional debt limit, and, in direct terms, stated what it was. Furthermore, in this same case, concerning the Bank of North Dakota, he further stated:

"It will thus be seen that the state is establishing the Bank of North Dakota as a fiscal agency for the transaction of its own business and as a fiscal agent for other purposes. It becomes, therefore, an important agency and means of properly carrying out the economic program which has been authorized by the people, and is a means to safeguard the interest of the people, and provides a safe depository for the funds in question, and one from which strict accountability may be required, as its accounts will be subject to the same examination as any other private banking institution of this state, by public examiner" (543).

Does not this opinion both recognize a constitutional debt limit and the Bank of North Dakota as an agency? If every act of the Bank of North Dakota is the act of the state itself, if every obligation and indebtedness created is the obligation and indebtedness of the state itself, how can there be any escape from the conclusion that the Bank Act must necessarily operate contrary to the Constitution of this state, both with reference to indebtedness created or to be created not warranted by the constitutional provisions, and with reference to loans to private individuals or private corporations.

Concerning state bonds issued for the purpose of providing capital for the Bank of North Dakota, it is specifically provided in the act authorizing such bonds, that nothing shall be construed to prevent the purchase of any of such bonds with any funds in the Bank of North Dakota. Laws 1919, § 4, chap. 148. When the Bank of North Dakota bought these state bonds from the state, and credited to itself the amount in money of such bonds, as its capital, what funds were used in payment of such bonds? Manifestly, the payment came from funds in the Bank of North Dakota, from deposits made by municipal subdivisions, private banks, or private individuals. Who, then, became indebted for the funds so used, the state or the bank? When a portion of these bonds so bought, and held by the bank, were pledged as collateral for a loan of $1,000,000, was the indebtedness of the state then extended so as to comprehend an obligation on the million dollars borrowed, as well as upon the bonds pledged? If the bank, pursuant to its powers, operates as a reserve bank, or a bank of rediscount, and it becomes necessary for it to borrow money, shall its obligation upon boney so borrowed, whether $1,000,000 or $10,000,000, be deemed the direct obligation of the state? So construed, what test is to be applied in determining the constitutionality of a legislative act? In State ex rel. Frich v. Stark County, 14 N. D. 368, 373, 103 N. W. 913, it is stated that its validity must be tested by what might be done, not by what has been done. What may be said of a judicial promulgation which would state to the people of this state that indebtedness without limit, or to any extent, might be incurred by the Bank of North Dakota, as the direct obligation of the state, in defiance of such constitutional provisions? Can the Bank of North Dakota, representing the state, as such, engage in contracts, create indebted-

ness, make loans, and do things that the state itself cannot do directly by reason of constitutional inhibitions? Complaint is made that the majority opinion has quoted decisions concerning state banks of the South, which concern corporations created as such. Do not these decisions demonstrate that the sovereign power may create an agency, a sovereign agency, and give to such agency a status, and that it is not necessary that it be termed a corporation in order that it do have the status of an agency? Does it not sufficiently appear that, necessarily, the Bank Act does create an agency of the sovereign power engaged in an enterprise with a distinct status as such, necessarily so to be regarded, in order that the constitutional provisions and the will of the people expressed in the legislative act may function in the enterprise designated?

Second. Is the Bank of North Dakota subject to garnishment? It is contended that garnishment is an attachment. That § 5188, Comp. Laws 1913, provides that every banking association in this state shall be exempt from the legal process of attachment and execution. That § 7583, Comp. Laws 1913, relating to the liability of a garnishee, expressly provides that property exempt from execution is not subject to garnishment. That the statute (Laws 1919, § 22, chap. 147, of the Bank Act) does not permit a garnishment action; that it refers to a civil action, and that garnishment is a provisional remedy.

The answer to these contentions must be made upon the Bank Act itself, the correlative statutes, and the decisions of this court applicable.

The statute provides that civil actions may be brought upon transactions connected with the operation of the Bank of North Dakota; that such actions may be brought in the same manner and shall be subject to the same provisions of law as other civil actions brought pursuant to the provisions of the Code of Civil Procedure.

Section 7581, Comp. Laws 1913, provides that the proceedings against a garnishee shall be deemed an *action* by the plaintiff against the garnishee and defendant as parties defendant, and that all proceedings of law relating to proceedings in *civil actions* at issue, including examination of the parties, amendments, and relief from default or proceedings taken, and appeals and all provisions for enforcing judgments, shall be applicable thereto. In F. B. Scott Co. v. Scheidt, 35

N. D. 433, 434, 160 N. W. 502, this court held that a garnishment proceeding is deemed an action, and that the provisions of law relating to civil actions are applicable.

In Park, Grant & Morris v. Nordale, 41 N. D. 351, 170 N. W. 555, this court specifically held that a garnishment proceeding in this state is entirely separate and distinct from either attachment or execution. These statutes and decisions were in force, and these decisions had been rendered when the legislative assembly had under consideration, and thereafter enacted, the Bank of North Dakota Act. Is it not to be presumed that they had notice of the statutory provisions concerning garnishment, and the construction placed upon the same by the decisions of this court? The legislature could easily have provided for exemption as to a garnishment proceeding. If it had intended so to do, is it not to be presumed that it would doubtless have said so? See Bovey-Shute Lumber Co. v. Erickson, 41 N. D. 365, 170 N. W. 630; Ruddy v. Rossi, 248 U. S. 104, 63 L. ed. 148, 8 A.L.R. 843, 39 Sup. Ct. Rep. 46.

Concerning the hail insurance fund (Laws 1919, chap. 160), there is a specific provision exempting a garnishment proceeding. Likewise, concerning the teacher's pension fund (Laws 1915, chap. 251). Do not the statutes and the decision of this court quoted therefore consider and treat a garnishment as an action, and subject to the provisions of law applicable to civil actions? Does not, further, the Bank Act by its plain terms, recognize the right to maintain such action, including a garnishment proceeding which is deemed an action?

Section 7567, Comp. Laws 1913, further provides that any creditor shall be entitled to proceed by garnishment in any court having jurisdiction of the subject to the action, against any person including a public corporation, etc. Under this statute may not a county, a city, a township, although agencies of the sovereign power, be made a garnishee defendant? If such agencies may be made garnishee defendants, what becomes of the assertion that garnishment process will not lie against sovereignty? The only apparent way to make such position unassailable is to declare the statute unconstitutional. In this case Sargent county, claiming $125,000 to be owing by the Bank of North Dakota, seeks to impose a personal liability upon the garnishee defendant for that amount. This garnishment proceeding against the

private banks does not ask for one dollar that the Bank of North Dakota has in its possession. It seeks to have the private banks, through a personal judgment against them, pay to Sargent county the amount which these banks owe the Bank of North Dakota, which amount, in turn, the Bank of North Dakota owes to Sargent county. Section 5188, Comp. Laws 1913, is contained in chap. 28, relating to private banking corporations. It provides that banking associations shall be exempt from the legal processes of attachment and execution. It does not provide that such banking association shall be exempt from the legal process of garnishment. It further provides that if any such bank fails to pay any final judgment, the State Banking Board shall declare such bank insolvent and cause a receiver to be appointed to wind up its affairs. The contentions made do not assert or maintain that the Bank of North Dakota is a private banking corporation. How, therefore, may they assert, or even contend, that such § 5188, Comp. Laws 1913, is to be applied?

But, if applied, the construction, for which contention is made by the defendant, would not permit a private bank to be a garnishee defendant. Upon such construction the deposit of a private individual in a private bank might not be subject to garnishment, for a private bank is not liable to the process of execution. Upon such construction, therefore, such private bank could not be made liable, because the personal judgment in garnishment was not subject to the process of execution. The answer to any such contention is that the legislature did not exempt, by the statute, the process of garnishment. Section 7583, Comp. Laws 1913, provides that the garnishee shall be liable to the plaintiff for property, money, credits, and effects, and all debts due or to become due to the defendant, except such as may be by law exempt from execution. What property, money, and debts are by law exempt from execution? Sections 7729 to 7743, Comp. Laws 1913, mentions the property that is exempt to the head of a family. It provides a method for claiming exemptions when property is so exempted by law. This statute plainly relates only to such property and debts as are by law exempt. It plainly has reference to property and debts that are both exempt and not exempt under the law. It has no refer-

47 N. D.—40.

ence to any exemption from the legal process of attachment or execution.

The statute in its plain terms permits an action to be maintained. It is plain to see that an action includes a garnishment proceeding. The statute by its terms does not include a garnishment proceeding. No specious reasoning nor arguments concerning sovereignty can over-rule these plain provisions contained in the statute. The court cannot do otherwise than uphold such plain statutory provisions. It may well be repeated that if constitutional provisions are to be set aside, and if the plain mandates of the statutes are to be wiped out, let it be done by those who created and enacted such constitutional and statutory provisions, the people. The petition for rehearing is denied.

GRACE, J. (further dissenting). The defendant, the sovereign state of North Dakota, has filed a petition for rehearing, which, unquestionably, should be granted. The importance of the issues involved; the deleterious effects which will inure to the people of this state if the majority opinion becomes final; the failure to give the plain and unmistakable intent of the provisions of the Constitution and laws, mentioned in my previous dissent, to those provisions and laws; the denial to the state of North Dakota of the right to engage in business in its sovereign capacity, though authorized to do so by the constitutional provisions and laws heretofore referred to in my former dissent, are each and all matters of great and far-reaching importance, directly affecting the happiness, prosperity, and right of self-government of the people of this state. Hence, they should not be decided and determined in the manner that the majority opinion, including the majority opinion upon petition for rehearing, does determine them, nor until further investigation of the legal principles involved, nor until further analysis by counsel, including the attorney general of this state.

The majority opinion, upon rehearing, clearly does not attempt an answer to the reasoning of my previous dissent. The reasoning and the principles stated in that dissent are so plain and so clearly right that, should the majority attempt to analyze them, they would soon find their position indefensible. The laws and the constitutional provisions, referred to in our former dissent, so plainly show that the

state of North Dakota, in its sovereign capacity, is engaged in business, that any contention to the contrary is absolutely useless.

To say that the state of North Dakota is not, in its sovereign capacity, engaged in the banking business, or in the mill and elevator business, or in the home building business, is to contend against the plain words of the statutes, authorizing the state, in its sovereign capacity, to engage in those businesses. To contend that the state, in its sovereign capacity, has not authority to do so, is to contend against the plain provisions of § 185 of the Constitution, as amended.

The state of North Dakota is engaged in the banking business, in its sovereign capacity, as the Bank of North Dakota. The majority opinion in effect holds that the Bank of North Dakota is a private institution.

The public and the public press have generally construed the meaning of the majority opinion to be that the Bank of North Dakota is a private institution. No other conclusion can be derived from the plain language of the majority opinion.

The state of North Dakota has, in its sovereign capacity, engaged in all of these businesses heretofore mentioned, including the banking business, and, to do so, it was necessary to resort to taxation of private property within this state. In order to warrant this step, it is necessary that the business engaged in be for a public purpose and a public use, and such are the businesses above mentioned. Hence, they cannot be private, as is clearly the conclusion of the majority opinions. The majority are forced into one position or the other.

In the case of Green v. Frazier, 44 N. D. 395, 176 N. W. 11, these constitutional provisions and laws were construed, and it was held, by this court (Justice Christianson dissenting), that the state was engaging in business in its sovereign capacity. This opinion, as we have before stated, was affirmed by the Supreme Court of the United States. See Green v. Frazier, 253 U. S. 233, 64 L. ed. 878, 40 Sup. Ct. Rep. 499.

Since the decision of the Green v. Frazier Case, there has been no change in either the constitutional provisions nor the laws in question. They remain the same as they were at the time that case was finally terminated. If there has been a change in the opinion of the majority of those who signed the opinion of the writer thereof, who

is the writer hereof that would not operate to change the fact that the constitutional provisions and laws in question there remain the same and unchanged, and mean the same now as they did then.

We are unable to determine whether the majority who signed that opinion have changed their minds. The majority in its opinion upon rehearing has, figuratively speaking, created a dust cloud, which may, to some extent, obscure the vital issues herein involved, but, notwithstanding this, we are able to look through and beyond it, to the sunlight of truth, which is found in the constitutional provisions and laws aforesaid.

The dust cloud consists in a weak endeavor to show that the state of North Dakota heretofore established a certain so-called agency of the state of North Dakota, and that such agency has a separate and distinct status from the state, and is seeking to apply the alleged analogy to the State of North Dakota, Doing Business as the Bank of North Dakota. In other words, seeking to show that this alleged agency has a separate and distinct status from the state.

These agencies are claimed to exist, with reference to several different subject-matters. The first of these is the state bonding fund, as created by chapter 62, Laws of 1915; the state hail insurance fund, chapter 23, Laws of 1911, chapter 160, Laws of 1919; state fire insurance, chapter 159, Laws of 1919; teachers' pension fund, chapter 251, Laws of 1915; workmen's compensation bureau, chapter 258, Laws of 1919; The United States Shipping Board, Emergency Fleet Corporation, a Federal Corporation, created by act of Congress.

The majority opinion, after reciting these various state laws creating certain funds, asks: Were not agencies of the sovereign power created? We answer, Absolutely no.

We cannot take time nor space to analyze all these laws creating the various funds. We will examine the State Bonding Fund Law, chapter 62, Laws of 1915, and let that suffice.

Firstly, the creation of a fund for a specific purpose, where the fund is to be accumulated, not by taxation by the state, of private property, but by payment into the state treasury, of the equivalent of certain premiums theretofore paid by various municipalities, in procuring the bonding of their officers by private agencies, is an entirely distinct matter, than where the state, in its sovereign capacity, engages in the

business of bonding, where, in such case, it would assume liability for losses, and become responsible, in its sovereign capacity, for the payment of those losses, and where, in order to engage in that business, it would be necessary for it to levy a tax upon the private property in the state, to secure a fund.

In the so-called state bonding fund, the state, in its sovereign capacity, never could, under the law creating that fund, become liable for a single dollar.

Section 11 of that act provides that it shall not become liable. All that the State Bonding Fund Law did, was to require the different municipalities to pay the premiums, the amount thereof which is specified in the law, into the state treasury, and to be accumulated there as a state bonding fund.

The Commissioner of Insurance was to issue the bond, not the state of North Dakota, nor the Commissioner of Insurance acting for the state of North Dakota. Of course, if an action were necessary to recover upon any of such bonds, it could not be maintained against any one else excepting the Commissioner of Insurance, for the state of North Dakota was not liable. The state was not in business; it did not bond anyone by that law; it assumed no liability nor responsibility for payment of those bonds. By that law, and all similar laws, referred to in the majority opinion, the state had simply exercised its police power, without incurring any responsibility in its sovereign capacity for so doing.

None of such funding laws make those intrusted with the handling and disbursement of those funds, agencies of the sovereign state, and none of them are agencies of the sovereign power.

All hail insurance laws, prior to the enactment of chapter 160, Laws of 1919, were amended and superseded by chapter 160. By chapter 160, the state entered the hail insurance business, in its sovereign capacity, and prescribed a fund out of which hail losses are to be paid, and also that said fund shall be raised by taxation; the amount that may be so raised by taxation, and the manner of levying that tax, is specified in that chapter. But neither the state nor the Insurance Commissioner can be sued for any loss. The state, in its sovereign capacity, has prohibited that, so that chapter 160 is strictly not in point, and does not support the majority opinion; and the analogy

sought to be created by the state bonding fund, and other similar funds, absolutely fails when applied to the state of North Dakota, engaged in the banking business.

But the majority opinion on rehearing, after reciting the State Bonding Fund Law and laws similar to it, and after seeking to show that the state bonding fund was an agency of the state of North Dakota, and the same with other laws creating similar funds, has the temerity to ask the following questions:

"Was not an agency created when the legislative act established the Bank of North Dakota?"

The question above asked by the writer is the one we have been endeavoring to get him to answer. He answers by asking the question. We will answer it. The answer to it is § 1 of chapter 147. It is as follows:

"For the purpose of encouraging and promoting agriculture, commerce, and industry, *the state of North Dakota shall engage in the business of banking,* and for that purpose shall, and does hereby, establish a system of banking *owned, controlled,* and *operated* by *it* under the name of the Bank of North Dakota."

Section 1 is a complete answer to that question. It speaks for itself. Its meaning is plain. It cannot be misunderstood. Does it not say plainly, that the state of North Dakota shall engage in the banking business? Does it not say that it shall own that banking business? Does it not say it shall operate that banking business? It says plainly, that *it, the state of North Dakota,* shall do a banking business, and it says,·also, in § 22, that "civil actions may be brought against *the state of North Dakota,* not against the Bank of North Dakota, on account of causes of action claimed to have arisen out of transactions connected with the operation of the Bank of North Dakota, etc."

Section 21: *"Title to property* pertaining to the operation of the bank shall be obtained and conveyed in the name of *the State of North Dakota,* Doing Business as *the Bank of North Dakota.* Written instruments shall be executed in the name of *the state of North Dakota,* signed by any two members of the *Industrial Commission,* etc."

All of these statutory provisions so plainly written in simple language are easy of comprehension. They all mean but one thing, and that is, that the state of North Dakota, in its sovereign capacity, is

engaged in the banking business, as it may lawfully do, by the provisions of § 185 of the Constitution as amended, and chapter 147 of the Laws of 1919, and other laws enacted to carry the intention of that act into effect.

There is not a word in the act creating an agency which shall engage in the banking business, but the act plainly provides that the *state itself* shall engage in the banking business. No amount of elaboration can make this statute plainer than it is. It is susceptible of but one construction, and it is that which we have given it.

Again, the majority opinion asks, and in asking assumes, something which does not exist, to wit, the agency.

"Does this agency function the same as the state?"

The answer is, It is not an agency functioning, for no agency exists, but it is the state that is functioning in its sovereign capacity.

Another question: "Why does this agency do a business under a distinct name, and all of its dealings under the head "Bank of North Dakota?"

Again, the word "agency" is improperly and unauthoritatively used, contrary to any intent of chapter 147. But the answer to that question is: That § 1 of chapter 147 provides that *the state of North Dakota* shall engage in the business of banking, under the name of the Bank of North Dakota. That means that when the state of North Dakota engages in the business of banking, in its sovereign capacity, *its* transactions in the banking business shall be transacted under the name of the Bank of North Dakota, and, as explained in my previous dissent, the words "under the name of the Bank of North Dakota" are merely descriptive, and are used to distinguish the engagements of the sovereign state of North Dakota, in business of banking, from its engagements, in its sovereign capacity, while engaging in the mill and elevator business, etc.

The language and intent of the statute in this regard are so plain as not to admit of controversy. They are self-evident.

The next question asked is:

"Are its funds (state of North Dakota, Doing Business as the Bank of North Dakota) public funds?"

In answering this question, we return to § 185 of the Constitution as amended, which authorizes the state, in its sovereign capacity, to

engage in the banking business.   Section 9 of chapter 147 provides:

"The Bank of North Dakota may receive deposits from *any source,* including the United States government and any foreign or domestic individual, corporation, association, municipality, bank, or government.   Funds may be deposited to the credit of the Bank of North Dakota in any bank or agency approved by the Industrial Commission."

If public funds of a county, township, or municipality are deposited in the Bank of North Dakota, they remain public funds of the county, township, or municipality, and are deposited with the state of North Dakota, in its sovereign capacity, exercised in doing a banking business in accord with the authority conferred by § 185 of the Constitution as amended, and chapter 147 of the Laws of 1919, and other laws enacted to carry that act into effect; and the obligations and indebtedness, if any, created, are the direct indebtedness of the state of North Dakota, in its sovereign capacity, engaged in the banking business.

Whether any such indebtedness exists is a question to which we will later refer, and to some extent then discuss, though no discussion thereof is proper in this case.

The next question asked reads thus:   (Further questions asked in the majority opinion will be indicated by the word question.)

"Is a deposit made by Jones, a private person, made a public fund, subject to disbursement by the state in payment of governmental expenses of the state?"

Section 9, supra, authorizes the receiving of deposits by private persons, and such a deposit would be and remain a private deposit, with a public institution, to wit, The State of North Dakota, Doing Business as the Bank of North Dakota.

Governmental expenses of the state of North Dakota are all provided for by law, and hence no necessity of using the deposits of private persons to pay governmental expenses.

Is not the salary of each of the judges of this court always provided for by law?   Likewise, the governor, the legislators, and all other state officers and officials?   Clearly, the question asked is superfluous and meaningless.

Question:   "When $1,000,000 was borrowed in Chicago and a note given therefor, was such a note a direct indebtedness of the state or of the bank?"

The answer is clear, that it was the indebtedness of the state, for it is the state of North Dakota that is engaged in the banking business, in its sovereign capacity, and this in pursuance of article 185 of the Constitution as amended, and chapter 147 and laws supplementary thereof. No other answer is possible.

Also, it may be observed, the $1,000,000 or $2,000,000, or whatever the amount may have been, of collateral security in the way of bonds, which were deposited with the Chicago Bank, to secure the $1,000,000, were the property of the state of North Dakota, in its sovereign capacity, and when the state of North Dakota, in its sovereign capacity, and in doing business as such, as the Bank of North Dakota, borrowed that $1,000,000, it, we may observe, did not increase its indebtedness a single dollar. For the Chicago Bank at all times had in its possession more property of the state of North Dakota, in the form of its bonds, than it had loaned money to the State of North Dakota, Doing Business as the Bank of North Dakota.

Question: "Were the millions of dollars on deposit in this bank in July, 1919, deposited by municipal subdivision, private banks, and private individuals, state public funds, and funds for which the state was directly obligated as such?"

We will answer this question in connection with the obiter dicta discussion thrown into the majority opinion, relative to the constitutional limitation of state indebtedness.

We wish now to answer one further question asked in the majority opinion, which is as follows:

"Was the United States Shipping Board Emergency Fleet Corporation created by the United States, with a capital stock of $50,000,000 all owned by the United States, and stated by congressional act to be considered a government establishment, the United States, or, an agency thereof?"

Answer: It was neither. It was just a simple, plain corporation, and the United States Supreme Court applied the same reasoning to it as I have analyzed in my previous dissent, in the Bank of United States v. Planters' Bank, 9 Wheat. 904, 6 L. ed. 244, and Briscoe v. Bank of Kentucky, 11 Pet. 257, 9 L. ed. 709. The United States Supreme Court, in the case of United States v. Strang, 254 U. S. 491, 65 L. ed. 368, 41 Sup. Ct. Rep. 165, in analyzing the nature and

functions of the United States Shipping Board Emergency Fleet Corporation, said of it, in an opinion written by Mr. Justice Reynolds:

"Counsel for the government maintain that the *Fleet Corporation* is an *agency* or *instrumentality* of the *United States*, formed only as an arm for executing purely governmental powers and duties vested by Congress in the President, and by him delegated to it; that the acts of the corporation within its delegated authority are the acts of the United States; that therefore, in placing orders with the Duval Company in behalf of the Fleet Corporation, while performing the duties as inspector, Strang necessarily acted as agent of the United States. The demurrer was properly sustained.

"As authorized by the Act of September 7, 1916 (39 Stat. at L. 728, chap. 451, Comp. Stat. § 8146a, Fed. Stat. Anno. Supp. 1918, p. 785), *the United States Shipping Board* caused the Fleet Corporation to be *organized* (April 16, 1917) under laws of the District of Columbia, with $50,000,000 capital stock all owned by the United States, and it became an operating agency of that board. Later, the President directed that the corporation should have and exercise a specified portion of the power and authority in respect of ships granted to him by the Act of June 15, 1917 (40 Stat. at L. 182, chap. 29), and he likewise authorized the Shipping Board to exercise, through it, another portion of such power and authority. See The Lake Monroe (Re United States) 250 U. S. 246, 252, 63 L. ed. 962, 966, 39 Sup. Ct. Rep. 460. *The corporation was controlled and managed by its own officers, and appointed its own officers,* and appointed its own servants and agents, who *became directly responsible* to it. Notwithstanding all its stock was owned by the United States, it must be regarded as a *separate entity.* Its inspectors were not appointed by the President, nor by an officer designated by Congress; they were subject to removal by the corporation only, and could contract only for it. *In such circumstances, we think they were not agents of the United States, within the true intendment of § 41.*"

Then, the United States Supreme Court cites in support of these contentions, Bank of United States v. Planters' Bank, and other similar cases, including Briscoe v. Bank of Kentucky. The same authority is cited in the majority opinion of this court, in its endeavor to show that the state of North Dakota was not, in its sovereign capac-

ity, engaged in the banking business, but that the Bank of North Dakota was a private banking institution, all of which authority, I conclusively show, through my former dissent, had no application to the questions, circumstances, or conditions involved in this case.

It is not necessary to elaborate upon the opinion of the United States Supreme Court, in the case of United States v. Strang, supra. So plainly it is against the theory of the majority opinion that it would be superfluous to make further comment upon it. It speaks for itself.

Since we have finished with that case, let us, now, take a case or state of facts which will, in reality, show the United States government, in its sovereign capacity, engaged in business, and thereby determine its course of conduct when it is so engaged. When the United States formally and constitutionally declared a state of war to exist between the United States and the Empire of Germany and its allies, it thereafter proceeded to directly engage in business in many respects. One illustration will be sufficient.

President Wilson, by virtue of the power reposed in him as Commander in chief of the United States Army and Navy, and for war purposes, by a proclamation, duly issued, took over and operated during the period of the war, and for one year thereafter, all, or practically all, of the railroads of the United States. Such railroads were all operated and controlled, absolutely, by the United States government during the time for which they were so taken over and retained.

The President appointed a director general to control and operate such railroads. In other words, the United States, in its sovereign capacity, through President Wilson, did this, just as the state of North Dakota, acting in its sovereign capacity, created the Industrial Commission to manage the banking business of the state of North Dakota, and the mill and elevator business, etc., and which Industrial Commission appointed a director general or manager of the banking business of the state of North Dakota.

Now, the United States, in its sovereign capacity, did operate and control those railroads during all the time above mentioned, and it, among other things, became subject to suit for damages for its negligence in the operation of those railroads. That suit was authorized to be brought against the Director General, but the suit in fact was

against the United States. For instance, if an employee of the United States, assisting in operating the railroads, for example, a brakeman, who, through the negligence of the United States, in the operation of the railroad, should be injured, by having his legs cut off, sustaining thereby great and irreparable damage, against whom, let us ask, should the employee bring the suit? He would bring it against the Director General, who represented the United States government; and let us suppose that he recovered a judgment of $10,000, could he get an execution out and levy upon some of the property of the United States, or could he garnishee some of its money in its postoffices? No. Nothing of this kind.

The judgment, while nominally against the Director General, was, in fact, a charge against the United States government, and was, in due course, paid out of the United States Treasury, either from profits earned by the operation of the railroads by the government, or by appropriations of Congress, to make up any deficiencies which accrued to the United States in its operation of the railroads.

Who did the Director General represent while acting in his position? The answer is plain: The United States government. If a suit were brought against the Director General, against whom, in fact, was it brought?

The answer must be, against the United States.

If the Director General made an order, as he did make thousands of them, with reference to the conduct of the railroads, whose order, in fact, was it?

Answer: It was the order of the United States government.

If the Director General placed an order for the construction of 5,000 new freight cars, who became responsible for the payment of them?

Answer: The United States government, and they were paid for out of the United States Treasury.

If a wreck occurred on the railroad, by reason of trains meeting in collision, and this through the negligence of some employee of the United States, engaged in assisting in the operation of the railways, and there resulted $100,000 in damages, which were recoverable by an action, who was liable in damages?

Clearly, the United States government.

Likewise, the United States government, through President Wilson, increased the freight and passenger rates. Whose act was that but that of the United States government? And that act or order was by members of this court who signed the majority opinion in the present case, with the exception of Justice Bronson, in the case of State ex rel. Langer v. Northern P. R. Co. 43 N. D. 556, 172 N. W. 324, declared illegal; they in effect said, the United States government had no authority to increase such rates and fares. The writer hereof, however, dissented from the majority in that case, and said in his dissenting opinion, the United States government did have the right and authority to increase such rates and fares.

From the decision of the majority, in that case an appeal was taken to the Supreme Court of the United States, and the decision of that court in effect made the dissenting opinion of the writer hereof in that case the law of that case. In other words, it, in substance, affirmed the dissenting opinion of the writer in that case, and necessarily reversed the opinion of the majority. See Northern P. R. Co. v. North Dakota, 250 U. S. 135, 64 L. ed. 897, P.U.R.1919D, 705, 39 Sup. Ct. Rep. 502, 18 N. C. C. A. 878.

So that we discern the United States government, in its sovereign capacity, did go into the railroading business, and during that time, no matter through whom the act was done, with reference to the management and operation of the railways, all of those acts were the acts of the United States government; and if the railways were in many instances negligently operated, so as to result in damages, the United States became answerable for those damages, and never denied liability after such damages were properly established, but paid them in due course through the Treasury of the United States. See Gladstone Eq. Exch. Co. v. Hines, ante, 454, 182 N. W. 763.

The United States also took over the telephone and telegraph lines, or most of them, within the United States. It took over various other industries and operated them, in its sovereign capacity. In other words, the United States, in its sovereign capacity, was doing business. It had engaged in industry, as it then lawfully might do, just as the state of North Dakota, by § 185 of the Constitution as amended, was duly authorized to engage in industry.

The state of North Dakota, in its sovereign capacity, doing business

as the Bank of North Dakota, or doing business as the Mill & Elevator Association, or as the Home Building Association, is operating and functioning in its sovereign capacity, and its business is carried on by those who, by legislative authority of the sovereign state, are authorized to carry it on, to wit, the Industrial Commission, just the same as the business of railroading was carried on for the United States, by all those employed by the United States to carry on that business, and who, while so employed, were employed by and acting for the United States. It operated and controlled the railways, in its sovereign capacity; and that situation, and that only, is parallel with the state of North Dakota, in its sovereign capacity, engaging in the different businesses heretofore mentioned, including the banking business.

Principles of law and rules of construction thereof applicable to the United States, when so engaged, are analogous to those principles of law and rules of construction which must be applied to the state of North Dakota, in its sovereign capacity, while engaged in industry and business, as authorized by § 185 of our Constitution as amended, and chapter 147 of the Laws of 1919, and laws enacted supplementary thereof.

Applying this test, we can reach but one conclusion, and that is, the state of North Dakota is engaged in business in its sovereign capacity. It did not create any corporations or associations, to transact that business for it. But the state of North Dakota, in its sovereign capacity, is transacting all that business, by and through the Industrial Commission, duly authorized and created by law, the membership of which consists only of state officers, to wit, the governor, commissioner of agriculture and labor, and the attorney general, none of whom receive any increased compensation for their services, but who at all times, as state officers and as members of the Industrial Commission, are executing the sovereign powers of the state of North Dakota.

We now approach the duty of answering another and a final question asked in the majority opinion, viz.: "Were the millions of dollars on deposit in this bank in July, 1919, deposited by municipal subdivisions, or private banks and private individuals, state and public funds and funds for which the state was directly obligated as such?"

By this question, the majority seek to introduce into this case the

question of the constitutional debt limit of the state. For what reason has the majority of this court introduced this question? It is nowhere involved in the case. It is not an issue nor a point in the case. It has not been raised by either side. It is not in the pleadings nor the record. It has been the universal rule of this court, and especially has it been the rule of the members who signed the majority opinion, that a constitutional question would not be decided unless presented on the appeal, and not *then* unless a decision thereof was *necessary* to a decision of the case. In other words, if a case is presented before this court, involving a constitutional question, as well as other points, and it can be decided upon the other points, without deciding the constitutional question, that is the course that is pursued.

In view of that rule, I am unable to comprehend the reason for the interpolation here of the question of the constitutional debt limit. A discussion thereof, as we view the matter, can only have the effect to distract attention from, and obscure, the real questions in this case, which are such only as I have stated in my former dissent.

Manifestly, anything said in the majority opinion, or in my dissent, or that I may say in this further dissent on that question, can be nothing but obiter dicta. In other words, it will be of no force nor effect. It will amount to nothing, and decides nothing.

When the question of the constitutional debt limit is properly and legally presented to this court, and it becomes necessary to determine that broad question in all its aspects, I shall not hesitate nor fail to analyze that question most thoroughly; nor shall I have any hesitation nor fear to express myself at that time, fully, on that question; and I have not the least doubt at that time, that I shall declare what I believe to be the constitutional debt limit. At that time, also, it will be the proper time to determine what, in fact, is a debt, or what is indebtedness, as those terms are to be defined in determining the constitutional debt limit as it exists at this time. But the inquiry is, whether the millions of dollars on deposit in the bank in July, 1919, were state public funds. In other words, the question is: Was there a liability on the part of the state to repay such deposits? Thereby, intimating that the state was in debt to that extent.

Well, let us see. Let us assume that, July, 1919, the state of

North Dakota, Doing Business as the Bank of North Dakota, received $10,000,000 of deposits, of various kinds, including deposits by private persons, associations, or corporations. This would nominally create the relation of debtor and creditor between the state of North Dakota and those depositors, and the State of North Dakota, Doing Business as the Bank of North Dakota charges itself on its books with the $10,000,000 of deposits.

Now, what does the state do with those $10,000,000 deposits? It redeposits the same in various banks of the state, both national and state, and perhaps a portion thereof is deposited in national and state banks outside of the state. Then, on its books it charges against all those banks, in the respective amount deposited with each, all of the $10,000,000. Now, by that transaction, has the state increased its indebtedness a single dollar? Will the books of the state, which it keeps in doing its banking business, show that it is in debt a single dollar by that transaction? Has the state, in fact, in reality increased its indebtedness? Or, if the state of North Dakota, doing a banking business, invests part of those deposits in United States bonds, or warehouse receipts, or assets which it may lawfully purchase, which are worth a hundred cents on the dollar, or an asset which is secured by two or three times its face value, has the state by these transactions created any debt?

We will set forth the expression of the Supreme Court of the United States on that principle. In the case of Darrington v. Bank of Alabama, 13 How. 12, 14 L. ed. 30, the Supreme Court of the United States speaking through Mr. Justice McLean, used the following language:

"The bank had not only an ample fund for the redemption of its paper, but a summary mode was provided by which the payment of its bills could be legally enforced. And the directors were personally liable, if the issues of the bank exceeded twice the amount of its capital paid in. And besides, the notes and bills of exchange taken on its discounts enlarged the means of the bank, and increased the security of the bill holders. The charter of the bank gave to it all the means of credit with the public, that banks usually have or could desire. That some reliance may have been placed on the guaranty of the eventual payment of the notes of the bank by the state may be

admitted. But this was a liability altogether different from that of a state on a bill of credit. *It was remote and contingent.* And it could have been *nothing more than a formal responsibility, if the bank had been properly conducted.* No one received a bill of this bank with the expectation of its being paid by the state."

Now, why was it that the Supreme Court of the United States stated that the liability of the state on its guaranty of the payment of the notes of the banks of Alabama was remote, contingent, and nothing more than a formal responsibility, if the bank had been properly conducted? Certainly, it was because the bank being properly conducted, and its deposits being maintained intact, or in the equivalent of assets worth a hundred cents on the dollar, and this would be true if the bank were properly conducted, the state of Alabama would have no liability on its guaranty.

The state Bank of Alabama was, under certain restrictions of the Constitution, duly authorized, and in pursuance thereof the general assembly of that state were authorized to establish a state bank with branches.

In 1823, the state bank was established by funds of the state then in the treasury, and a loan obtained from an issue of state bonds. In 1832, the bank at Mobile was established, with a capital stock of $2,-000,000, procured from a sale of the bonds of the state. The Bank of Alabama was organized as a corporation, and, by the charter, a president and fourteen directors were annually elected by the legislature. The corporation was authorized to issue notes of a denomination of not less than $1. The ordinary powers of a banking corporation were conferred, with a prohibition of owing debts aggregating twice the amount of capital; and the directors were made personally responsible for any excess indebtedness of the bank assented to by them.

The state of Alabama was the only stockholder of the bank. Certain bills were issued by the bank. In the charter creating the bank, the credit of the state was pledged to redeem the notes of the bank, and it was with reference to that pledge, or in a sense guaranty, that the United States Supreme Court used the above language, demonstrating that such liability of the state could only be contingent or formal, etc., if the bank were properly conducted.

47 N. D.—41.

So, we may reason, if the State of North Dakota, Doing Business as the Bank of North Dakota, properly conducts that banking business, and receives $10,000,000 deposits from various sources, and redeposits the same in other banks within the state, or mostly within the state, it would seem to a reasonable mind that the liability of the state of North Dakota for such deposits would be a mere contingent or formal responsibility. In other words, there would likely, in fact, be no debt, or indebtedness, thereby actually existing. For, it at all times has on redeposit the same amount of money which it received from the depositors to repay them, or it has the equivalent thereof, in assets worth a hundred cents on the dollar. The indebtedness, in these circumstances, would in all probability be properly denominated as merely nominal or formal.

In other words, the pertinent query is: If the state, in its sovereign capacity, doing a banking business, receives $10,000,000 of deposits, and retains the same, or redeposits it, and at all times has possession or control of it, or if part of it has been invested in gilt-edged assets, and it has those assets, all of which are equivalent to the $10,000,000, has the state incurred any indebtedness? This, and kindred questions, will be analyzed to their finality, when the question of the constitutional limitation of the state's indebtedness is presented in all its aspects. It is impossible and improper to go into that question in this case. It was not presented to the trial court, and is not in the record on appeal presented here. Further obiter discussion of that subject would be useless.

The issues presented in this case are simple and clearly defined. They should not be obscured by the introduction of extraneous questions in no way involved in the case.

But Justice Birdzell has also filed a long opinion on rehearing, in which he introduced severel additional constitutional questions, none of which are involved in this case. Nor are they contained in the record, nor presented in the appeal. All of them are absolutely extraneous to the questions involved in this case, and which are presented by the record. As above stated, the only effect of introducing such extraneous questions is to obscure the real questions involved in this case, which are only two, as shown in my former dissent.

Should the final decision of this case be delayed a few days longer,

it would appear that some of the majority will have, perhaps, discussed in their opinion almost every provision of the Constitution and the amendments. All such discussion is merely obiter in this case, and nothing less.

Justice Birdzell, in his discussion, uses the following language, in his obiter discussion relating to future indebtedness, and we may examine it by further obiter discussion:

"A concrete example may serve to illustrate the fallacy of the argument. If the funds on deposit, public or otherwise, in the Bank of North Dakota seemed to the management to justify it, the bank might purchase $5,000,000 of the bonds of the mill and elevator series. It would still owe to the depositors the amount of deposits thus invested, but the state would owe the bank a like sum. Then the bank might borrow $4,000,000 elsewhere, pledging these bonds as collateral, in which event the state, if petitioner's argument is sound, becomes indebted to the extent of $9,000,000, only $5,000,000 of which is represented by bonds. Then this $4,000,000 could be used to buy more bonds to serve as collateral for another loan, and so on. What, then, has happened to this provision of the Constitution:

"No future indebtedness shall be incurred by the state unless evidenced by a bond issue, which shall be authorized by law for certain purposes?"

Our learned justice is confounded in two regards: First, as we view it, in his arithmetic, and, second, as to the matter of indebtedness. It is our view, under § 185 of the Constitution as amended, and chapter 147 of the Laws of 1919, and laws supplementary thereof, that the state, in its sovereign capacity, is doing a banking business. This is the fact, and, with this fact in mind, we will analyze Justice Birdzell's "concrete example."

Now, if the state of North Dakota, in its sovereign capacity, doing business as the Bank of North Dakota, purchases $5,000,000 of the bonds of the mill and elevator series, it has received thereby property just as valuable as the money with which it parted. It did not, in fact and in reality, thereby create any indebtedness. The state of North Dakota would owe the depositors the $5,000,000, but it has then in its possession $5,000,000 of assets, the mill and elevator bonds so purchased. Then, supposing the state of North Dakota, doing

business as the Bank of North Dakota, should, as the concrete example assumes, borrow $4,000,000. It then has received, and again has in its possession $4,000,000, and the party from whom it borrowed that $4,000,000 yet has $1,000 of the state's property, in the form of bonds, in excess of the $4,000,000 which he loaned to the state. In other words, the state still- has, and owns, just as much property and money as it invested in the bonds in the first place.

To make the illustration plainer, we will assume that the state should take the $5,000,000 of mill and elevator bonds, which it so purchased, and use them as collateral, and borrow $5,000,000 on them. It would, then, have $5,000,000 in its possession, which would be the same amount it invested in the mill and elevator bonds. How, in all of these transactions, has the state increased its indebtedness?

In all such transactions, or assumptions, it must be assumed and conceded that the bonds so purchased would be of the value of 100 cents on the dollar, so that a thousand dollar bond is equal in value to a thousand dollars in money. In other words, has the state increased its indebtedness by the transaction? Is there, in fact and reality, any indebtedness, or increase of indebtedness, except as a matter of book-keeping?

The bonds assumed to be purchased must be rated at their par value. Otherwise, the state would not purchase them. If they are worth their face value, would the mere re-exchange again of them, for money, increase the state's indebtedness? If there were, in fact and reality, no increase in indebtedness, could the provision of the Constitution referred to be invoked? Would there not have to be an actual, real, and bona fide increased indebtedness, and not a mere bookkeeping indebtedness, before that provision of the Constitution would be set in motion?

The trouble with arguments such as are contained in Mr. Justice Birdzell's opinion, in the regard above stated, is the same trouble that occurs in Mr. Justice Bronson's opinion. They do not seem to concede that the state of North Dakota, under § 185 of the Constitution, is actually engaged, in its sovereign capacity, in the banking business. They do not seem to properly discuss or construe or notice, the part of § 185 of the Constitution as amended, which authorizes the

state to engage in any industry, enterprise, or business not prohibited by article 20.

But that provision is a part of the Constitution, and equally as important as other provisions of it, and this is a subject we will consider a little later, in connection with what Justice Bronson has to say in his opinion, with reference to § 185 of the Constitution as amended; or rather with what he has not to say in that regard, and our reasoning there will apply to more of Justice Birdzell's opinion.

In the majority opinion on rehearing, we find the following:

"The dissenting justice refers to § 185 of the Constitution, which provides that the state may not loan or give its credit in aid of any individual, association, or corporation. The Bank Act, however (§ 15), states that the Bank of North Dakota may make loans to an individual, association, or private corporation. Is this section of the act unconstitutional because the bank is the state, or rather is it to be said that this agency, as an agency, possesses the function so to make loans?"

Certainly, that statement does no justice to the erudition of the learned justice who penned that language. He has forgotten to consider that § 185 as amended authorized the state of North Dakota to engage in industry and enterprise. It is thus authorized to engage in the enterprise of banking, and while engaged in that enterprise, it may, in strict pursuance of the constitutional right secured to it under § 185 as amended, make loans to individuals, associations, or private corporations.

But, if § 185 as amended is erroneously construed, or if not given force nor effect, then the right and authority of the state to loan its credit or money to a private individual, association, or corporation, no longer exists. But if, as we believe, the original majority opinion holds that the Bank of North Dakota, is a private bank, or a private institution, and that is the universal construction placed upon that opinion, how, then, can the majority of this court who signed that opinion justify the state in loaning to their so-called private association or bank or institution, $2,000,000? That would be the loaning of the money and credit of the state to a private institution (if the majority opinion is correct, which it is not), in contravention not only of § 185 as amended, but in contravention of it before it was amended. The

state, in its sovereign capacity doing a banking business, has a constitutional right to loan its credit to private individuals, associations, or corporations, for it is authorized constitutionally to engage in the banking business, by § 185 as amended.

When the state of North Dakota, in its sovereign capacity, doing business as the Bank of North Dakota, loans its money or credit to private individuals, associations, or corporations, it does so in strict accordance with said § 185 of the Constitution as amended. That is its constitutional authority for so doing, and it is done in pursuance of that section of the Constitution.

But, it may be asked, if that be true, what is the meaning of the balance of § 185 as amended, which says:

"But neither the state nor any political subdivision thereof shall otherwise loan or give its credit or make donations to or in aid of any individual, association, or corporation except for reasonable support of the poor, nor subscribe to or become the owner of capital stock in any association or corporation."

The first part of that section is as follows:

"Section 185 in article 12 as amended by article 18 of amendment. The state, any county or city may make internal improvements *and may engage in any industry, enterprise* or *business* not prohibited by article 20 of the Constitution." (article 20 relates to prohibition.)

Now, are these provisions in any way in conflict? We think not, and we will endeavor, to the best of our ability, to demonstrate that proposition.

When the state itself is engaged in business, it is engaged in it for a public purpose and a public use, and under that section of the Constitution as amended, it is constitutionally authorized to carry on that business, and it is not prohibited from giving its credit, but is authorized by that section of the Constitution to use its credit in carrying on that business.

But, notwithstanding this, it was just as necessary to retain the prohibition in that section against the state giving its credit to any private individual, association, etc., and we will endeavor to illustrate this by an example.

Let us assume that a private corporation was, in this state, organized for the mining and distribution of lignite coal. Let it be as-

sumed that such private corporation applied to the legislature for a loan or an extension of credit for the purpose of carrying on that private business, and that the legislature should, in compliance with that request, make an appropriation of $2,000,000, as a loan to that private corporation. Could the legislature do this? Could it thus give or loan its credit to this private mining corporation? Is it not prohibited by § 185 as amended, and as § 185 was before it was amended, from doing this, and is this not the reason why that provision is retained in § 185 as amended?

It must not be forgotten that the state is engaged in its sovereign capacity, only in a very limited number of businesses, principally these are the state of North Dakota, in its sovereign capacity, doing a banking business, and in that same capacity, doing a mill and elevator business; and these businesses it is doing for a public purpose and a public use.

But there are hundreds of other different kinds of business carried on in this state by private individuals, associations, corporations, etc., with which the state is in no way interested nor connected, so far as operating them is concerned. It is to prohibit these from applying to the state, through the legislature, to give its credit to them, that it is necessary to retain the prohibition in reference to the state lending its credit to private individuals, associations, or corporations.

It seems quite clear to us that the state of North Dakota, in its sovereign capacity, by § 185 as amended, was constitutionally authorized to engage in industry, enterprise, and business, and that, by that provision of the Constitution, and the laws which we have mentioned in our previous dissent, and other laws supplementary thereof, a few millions of dollars of bonds have been lawfully authorized to issue, for the purpose that the state, in its sovereign capacity, might carry on such businesses.

Great concern is manifested by some, that such bonds have been duly authorized to be issued. They seem to fear that the state will go bankrupt if the sovereign will of the people, approving these industries, is carried out. But we think it was the intention of the sovereign will of the people, by determining to go into these industries, to benefit all the people of this state, and to build up its credit and industries, and to prevent great and irreparable loss annually occurring

to the wealth-producing people of this state; and we think the taxes which the sovereign people have, by law authorized to provide for the payment of these bonds, would be small in comparison with some taxes of which we are about to speak, which are not levied by law, but in a way just as effective, so far as depleting the resources of the wealth-producing people of this state.

Let us assume that the legislature, at its session—assuming that it had the power to do so—had levied a tax of $200,000,000 on the wealth-producing people of this state for the year 1920, and by wealth-producing we mean principally the agricultural interests of this state, every one would be compelled to admit that such a burden would be seemingly unbearable, but we think it is practically common knowledge that such a burden has been imposed, though not by the legislature, on the farmers of this state in the year 1920.

Let us see. The wheat production of this state for that year was approximately 65,000,000 of bushels. At about harvest time, it was worth approximately $2.65 a bushel. The actual cost in raising that wheat was about $2.50 per bushel. In the fall and winter, when the time had arrived, after the farmer had done his plowing and threshing, for him to haul this wheat to market, it was, on the average, worth approximately about $1.25 a bushel.

In any event, he had lost at least a dollar a bushel. In other words, he was compelled to sell his wheat at a dollar a bushel less than it cost him to raise it. This would be about $65,000,000.

Now, in this state, in additon to wheat, the farmer raises oats, flax, barley, corn, potatoes, hogs, cattle, sheep, and many other articles of production not necessary to mention, all of which had a high market value about harvest time, but the prices of which, later in the fall, began to sink rapidly, until they had reached a very low figure. The loss in this regard may not be capable of definite ascertainment, but we do not think anyone who has any knowledge on those subjects would say the decrease in valuation on those articles, excepting wheat, has been less than a hundred millions of dollars, and perhaps was a great deal more than that amount. And we do not think it is an extravagant statement to say, that the farmer's loss, by decrease in value of his products, including wheat, an unnecessary and unwarranted decrease, during the fall of 1920, and later was approximately $200,-

000,000. This loss was an actual loss, being that much less than it cost him to produce those articles. In other words, the farmers of this state have $200,000,000 less after those articles were produced than it cost them to produce them. This, in the face of the admitted fact, that the demand for those articles was just as great at the time the prices of those articles were so reduced as it was at harvest time, when prices were what they should have been.

Can anyone say that in effect this is not a direct tax on the farmers of this state? Now, for twenty-five years or more this situation has existed in this state, and during that time the losses have been annually some greater, or some less, than for the year 1920. That same situation has been prevailing all over the United States, and, as a result of it, the farmers have been thus indirectly taxed out of the ownership of their farms, so that, to-day, approximately 50 per cent of the tillable land of the United States is occupied by tenants. In other words, that percentage of the farmers no longer own their farms.

In some states the percentage is a little less, and in some a little greater, than the amount above stated; and, as further proof of this, we find in the last census report that the population of the cities exceeds that of the country. In other words, a large percentage of the farmers, under this continual, annual loss of selling their products for less than it cost them to produce them, have become bankrupt and have moved to the larger cities, hoping there to settle with their families, and there all of them labor in order to gain the sustenance of life.

In order to prevent this loss, which is fast bankrupting the farmers of this state, the people, in their sovereign power, adopted § 185 of the Constitution as amended, and by laws duly passed by the legislature, referended, and again passed by the people, the state, in its sovereign capacity, is permitted to engage in business.

Our only duty is to construe and interpret those laws, and to try, to the best of our ability, to ascertain the meaning thereof. This, we have done, and we think our interpretation is the correct one.

We are not here going to give any additional extended discussion, with reference to the garnishment proceedings. The contentions which we have made with reference thereto, in our previous dissent, and the conclusions there arrived at in this regard, we think, in the circumstances of this case, are correct.

We conclude this further dissenting opinion by again stating, as we stated in our former dissent, that the real questions involved in this case are:

First, the status of the state of North Dakota; and, second, the right to avail of garnishment process in a proceeding against the state of North Dakota.

And those questions, and those questions only, are the ones which the writer hereof passes on and decides.